**FLAGSHIP WEST, LLC,
et al., Plaintiffs,**

v.

**EXCEL REALTY PARTNERS,
L.P., et al., Defendants.**

**No. CV–F–02–5200 OWW/DLB.**

United States District Court,
E.D. California.

Dec. 20, 2010.

John D. Fairbrook, Trainor Fairbrook, Sacramento, CA, Whitney F. Washburn, Law Offices of Whitney F. Washburn, Folsom, CA, for Plaintiffs.

Christopher N. Jones, Mark E. Kogan, Kogan, Trichon & Wertheimer, P.C., Philadelphia, PA, Stephen E. Carroll, McCormick Barstow Sheppard Wayte and Carruth LLP, Fresno, CA, Mark H. Epstein, Munger Tolles & Olson LLP, Los Angeles, CA, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR INTERPRETATION OF LEASE (Doc. 500) AND DENYING DEFENDANT'S MOTION TO STRIKE AND/OR FOR LEAVE TO FILE SUR–REPLY BRIEF (Doc. 508)

OLIVER W. WANGER, District Judge.

This case is before the Court after remand by the Ninth Circuit Court of Appeal. The Ninth Circuit reversed the Court's granting of Flagship West, LLC's and Marvin and Kathleen Reiche's ("Flagship") election of rescission of its lease with Excel Realty Partners, L.P. ("Excel") after a jury found that Excel materially violated an "exclusive use" provision of the lease. The trial court ruling that judicial estoppel precluded Excel from asserting that § 4.5 of the lease bars rescission, was not warranted and the limited remand was "so that the district court may determine in the first instance whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances." Specifically:

> Excel ... appeals the district court's order granting Excel's tenant ..., rescission of its lease based on a determination that Excel materially violated an 'exclusive use' provision of that lease. The district court invoked judicial estoppel to prevent Excel from asserting that § 4.5 of the lease bars rescission. Because we find judicial estoppel was not warranted here, we remand for the district court to determine whether rescission is an available remedy under California law and the terms of the contract.
>
> . . .
>
> First, Excel's litigation positions were not clearly inconsistent. There is no evidence that Excel ever conceded that rescission was available to Flagship. Although the Pretrial Order did not specifically cite § 4.5 of the lease or discuss all of the arguments that might be based on the section, it acknowledged that Excel contested Plaintiffs' entitlement to rescind, at least on both materiality and independent covenant grounds. Other related arguments that rescission was not available, including the contractual limitation on remedies argument at issue, were adequately embraced within the order . . . .
>
> Second, the district court never relied on a party's inconsistent statements ... Even though the district court may have been under the impression that rescission was being 'actively litigated,' judicial estoppel is not appropriate unless the court made rulings in reliance on an admission by Excel that rescission was in fact available. No such reliance is possible here because, throughout the proceedings, Excel actively contested the availability of rescission on a theory-by-theory basis. Excel had no legal ob-

ligation to pursue a general legal argument against rescission prior to its more narrow arguments because the argument regarding limitation of remedies available under the contract is not an affirmative defense under Fed.R.Civ.P. 8(c) . . . .

Third, allowing Excel to raise its contractual remedies limitation argument after the jury had deliberated did not give Excel an unfair advantage or impose an unfair detriment on Flagship. Even if Excel had raised the argument at an earlier stage, the same factual issues would have been put to the jury to determine liability for damages.

Consequently, we vacate the district court's judgment awarding rescission damages to Flagship and remand so that the district court may determine in the first instance whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances. We do not reach either party's claims related to the calculation of rescission damages and express no opinion on those claims.

A supplemental scheduling conference was held. The Supplemental Scheduling Conference Order filed on August 14, 2009 (Doc. 499), states: "Plaintiff shall not raise any new matter in the reply memorandum of law."

Flagship seeks interpretation of § 4.5 of the lease as not precluding rescission of the lease. Excel opposes Flagship's motion.

## A. BACKGROUND.

Excel is the owner of the Briggsmore Plaza in Modesto. On July 16, 1998, Excel executed a 15 year ground lease ("Lease") with Flagship, whose only members are the Reiches, for a stand–alone 10,000 square foot lot (the "Property") in the Briggsmore Plaza for the purpose of con-

structing and operating a buffet style restaurant under the Golden Corral franchise (the "Restaurant"). The Lease provides that Flagship has the "exclusive right to operate a self service buffet style family restaurant within the Shopping Center." (Lease § 6.3).

To construct the Restaurant, Flagship borrowed a 25 year, $2 million loan from The Money Store, which was secured by a deed of trust on Flagship's leasehold interest in the Property. The Reiches also executed written personal guarantees of the loan. The Restaurant opened on June 10, 1999. Approximately a year later, the Four Seasons, a buffet restaurant serving Chinese food, opened in the Briggsmore Plaza in a location directly across from the Restaurant. Based on an express lease provision, Flagship contended that the operation of the Four Seasons breached their exclusive right to run a buffet style restaurant in the shopping center and caused the Restaurant to become unprofitable, leading to its closure on April 1, 2001.

Flagship filed suit against Excel, alleging breach of contract, fraud, and negligent misrepresentation, seeking contract damages and rescission. In the Pretrial Order, Flagship requested a jury trial on all issues, while Excel relied on Flagship's jury demand instead of making one themselves. The case was tried to a jury. The trial commenced on November 12, 2003 and verdicts were returned on December 3, 2003. The general verdict with interrogatories found in favor of Flagship and awarded Flagship $1,502,000.00 in contract damages. Specifically, the jury found that Flagship proved "by a preponderance of the evidence, that Defendant Excel Realty Partners, L.P., breached the lease by leasing space in the Briggsmore Plaza to Bi Wen Liu for the operation of the Four Seasons Buffet" and Excel's "breach of paragraph 6.3 of the lease agreement [was]

material." (Doc. 280). Entry of judgment was deferred to allow Flagship to elect the remedy of rescission and any rescission damages or damages for breach of contract.

The "Order Re: Post Trial Election of Remedies; Defendants' Claimed Rescission Waiver Clause; Defendants' Claimed Damage Limitation Clause" filed on November 19, 2004 (November 19, 2004 Memorandum Decision; Doc. 353), notes the parties' extensive post-trial briefing, addressing a number of issues. Rescission was elected and rescission damages awarded. A remedies lease provision barring rescission was found unenforceable.

### B. *FLAGSHIP'S MOTION FOR IN-TERPRETATION OF LEASE.*

The primary issue before the Court is the proper interpretation of § 4.5 of the lease.[1] Section 4.5 provides:

> 4.5 *Triple Net Lease.* Tenant's Basic Rent and Additional Rent shall be absolutely net to Landlord, so that this Lease shall yield to Landlord the full amount of the installments of Basic Rent and Additional Rent throughout the Term, and shall be paid without assertion of any counterclaim, set off, deduction or defense and without abatement, suspension, deferment, diminution, reduction or refund of any kind, except as expressly set forth herein. Under no circumstances whether now existing or hereafter arising, or whether beyond the present contemplation of the parties, shall Landlord be required to make any payment or refund of any kind whatsoever or be under any obligation or liability hereunder, except as expressly set forth herein. Except as otherwise expressly set forth in this Lease, this Lease shall continue in full force and

effect, and the obligations of Tenant hereunder shall not be released, discharged or otherwise affected, by reason of any of the following: (a) any damage to or destruction of the Premises or any portion of either or any Taking of the Premises or any portion of either; (b) any restriction or prevention of or interference with any use of the Premises or any portion of either; or (c) any other occurrence whatsoever, whether similar or dissimilar to the foregoing, in each case, whether or not Tenant shall have notice or knowledge of any of the foregoing. The obligations of Tenant in this Lease shall be separate and independent covenants and agreements. Tenant hereby waives, to the fullest extent permitted by the applicable law, any and all rights now or hereafter conferred by statute or otherwise to quit, terminate or surrender this Lease or the Premises or any portion thereof, or to any abatement, suspension, deferment, diminution, reduction or refund of Basic Rent or Additional Rent, except as otherwise expressly set forth herein.

#### 1. *Independent and Separate Covenants.*

■ Excel argues that rescission is barred because Flagship's obligations under the Lease are explicitly made separate and independent covenants by Section 4.5. Excel refers to the "Order Re: Post Trial Election of Remedies; Defendants' Claimed Rescission Waiver Clause; Defendants' Claimed Damages Limitation Clause," filed on November 19, 2004, (November 19, 2004 Memorandum Decision, Doc. 353), and specifically to 49:2–3 and 51:8–15:

> Plaintiffs were experienced and sophisticated restaurant operators.

---

1. At the hearing, Excel asserted that the Ninth Circuit's Memorandum remanding this case ruled that Section 4.5 constitutes a limitation on Flagship's right to rescind the lease. No such ruling can be inferred from the Ninth Circuit's Memorandum.

. . .

With respect to § 4.5, the Lease shows that the parties modified the provision, striking out the term 'or the Access Area' several times. These changes were ratified by initials 'MGR' (Marvin G. Reiche) in the margins. See Doc. 302, Ex. A, Lease, at 4. Plaintiffs cannot claim that § 4.5 escaped their notice.

Excel relies on these statements to assert that Section 4.5 was bargained for between sophisticated parties at arm's length. Therefore, Excel contends, Flagship cannot rescind or otherwise avoid their obligations under the Lease based on a violation of the exclusive use provisions in Section 6.3 of the Lease and asserts that Flagship's sole remedy is damages for Excel's breach of the exclusive use provisions.

Excel argues that it is unaware of any court that has allowed rescission for breach of an exclusive use clause in a lease that also provides that such clause is an independent covenant. Excel refers to the "Memorandum Decision and Order Re Post–Trial Election of Remedies" filed on September 30, 2005, 2005 WL 4701939 (September 30, 2005 Memorandum Decision, Doc. 362), at 14:13–17:

> Breach of an independent covenant does not warrant rescission because, by definition, breach of an independent covenant is not material. By its very nature, an independent covenant does not run to the whole of the consideration.

However, Excel's reference to the September 30, 2005 Memorandum Decision is incomplete:

> Defendant asserts that materiality is not the central inquiry, and rather, the key inquiry is whether the covenant breached is independent. It is true that some courts approach the question of rescission based at least in part on an analysis of whether the provision breached was a dependent or independent covenant.

See, e.g., Medico–Dental, 21 Cal.2d at 418–19 [132 P.2d 457]; Mills, 56 Cal. App. at 776 [206 P. 486]. This follows because the factors that determine whether a covenant is independent, overlap with the factors that in determine [sic] whether a breach was material. Medico–Dental, 21 Cal.2d at 433 [132 P.2d 457]. Breach of an independent covenant does not warrant rescission because, by definition, breach of an independent covenant is not material. By its very nature, an independent covenant does not run to the whole of the consideration. However, what Defendant has not provided is citation to any authority holding that exclusive use provisions, such as the one at issue here, are independent covenants as a matter of law. In fact, the courts in the two cases upon which Defendant relies, Kulawitz and Medico–Dental, found that the exclusive use covenants at issue there were dependent, based on an analysis of the factors and the factual record.

> In this case, the jury has already made a finding that the breach was material. It is not necessary for the court to now decide, as a matter of law, that the covenant at issue was independent. The provision was integral to the Lease, which would not have been entered into without it. The answer to the mixed question of law and fact as to independence of the provision is irrelevant to the question whether the Plaintiff is entitled to elect rescission. The jury's finding of materiality provides sufficient grounds for rescission, according to well-established California law.

(September 30, 2005 Memorandum Decision at 14:4–15:5).

Excel argues that Kulawitz v. The Pacific Woodenware and Paper Co., 25 Cal.2d 664, 155 P.2d 24 (1944) and Medico–Dental Bldg. Co. v. Converse, 21 Cal.2d

411, 132 P.2d 457 (1942), "stand for a proposition that has no bearing on this case." Excel contends that "[a]bsent an express statement in the lease that covenants are independent, a court may determine that the covenants involved are conditions precedent so that a breach may justify rescission if it goes to the heart of the matter." Excel contends that such analysis is only necessary where there is no explicit agreement by the parties and is unwarranted here "because the Ground Lease specifies that Plaintiffs' obligations are independent of Excel's compliance with its obligations." Excel asserts that the jury verdict of "material breach" during the breach of contract phase of the trial "does not overrule the clear tenant of California law that where the parties to a contract agree that the terms thereof are independent covenants, a breach will not justify rescission."

Excel's contention that Section 4.5 makes *Excel's* obligation to honor the exclusive use provisions of the Lease an independent covenant ignores the express wording of Section 4.5: Section 4.5 deals with a tenant's obligation to pay rent and provides that "[t]he obligations of Tenant in this Lease shall be separate and independent covenants and agreements." Section 4.5 does not provide that any of the landlord's obligations under the Lease are independent covenants. As Flagship asserts: "Defendants cite no authority in support of their position, and without explanation assert that because the Lease states Tenant's obligations are 'independent covenants,' that the Landlord's obligations are independent as well." Flagship cites *Medico–Dental, supra,* 21 Cal.2d at 419, 132 P.2d 457, in turn citing 32 Am.Jur. § 144, that " 'covenants and stipulations on the part of the lessor and lessee are to be construed to be dependent upon each other or independent of each other, according to the intention of the parties and the good sense of the case, and technical words should give way to such intention.' " Flagship contends:

Excel's interpretation patently ignores the circumstances of this case, the undisputed evidence that the exclusive use provision was central to the Lease, and the jury's finding of materiality, in arguing that a clause providing that the *Tenant's obligations* are independent also means the Landlord's obligations are independent. In making this argument, Defendants are asking the court to read the word 'Landlord' into the provision, without any supporting evidence that that is what was intended by the parties.

Contrary to Excel's contention, Flagship argues, there is no "express statement" in the Lease making Excel's obligation to honor the exclusive use clause an independent covenant. Flagship argues that Excel's interpretation of Section 4.5 allows Excel to treat every obligation it had under the Lease as optional, precluding Flagship from rescinding the Lease under any circumstances:

Excel presents no support for its position that any party can be required to stay in a contract which the other party has materially failed to perform. Without the consideration Flagship expressly bargained for, the Lease failed. The language making Flagship's covenants to pay rent 'independent' did not in way [sic] alter Defendants' obligation to honor the exclusive use provision, and does not make that provision any less central to the parties' bargain.

Excel argues that Section 6.3 of the Lease provides a remedy in damages for breach of the exclusive use clause. Section 6.3 provides:

6.3 *Exclusive Use Rights.* Subject to the conditions and restrictions set forth herein, Tenant shall have the exclusive right to operate a self service buffet

style restaurant within the Shopping Center, except that such exclusive right:

. . .

(h) Shall not result in Landlord being liable to Tenant for monetary damages for any other tenants' or occupants' violation of such exclusive use privilege of Tenant unless, with respect to future tenants or occupants ..., Landlord has failed to restrict such tenant or occupant from violating Tenant's exclusive use privilege granted in this Lease . . . .

Flagship responds that Section 6.3(h) does not restrict the tenant from rescinding the Lease if Excel failed to prevent future tenants from violating Flagship's exclusive use privilege. Flagship notes that Excel cites no authority that a damages provision limits the ability of a party to a contract from rescinding the contract because of a material breach. Flagship cites California Civil Code § 1692, which provides that "[a] claim for damages is not inconsistent with a claim for relief based upon rescission." Flagship refers to the November 19, 2004 Memorandum Decision that "[i]n the event rescission is elected, § 22.25 cannot be enforced as rescission avoids enforceability of clauses of the Lease, including damage limitations."

Flagship's contentions are well-taken. Section 4.5 by its terms provides that the tenant's obligation to pay rent under the lease is an independent covenant. Section 4.5 does not refer in any way to the landlord's obligations to the tenant under the lease. To the contrary, Section 6.3 imposes an express duty on Excel to restrict any other tenant from violating Flagship's exclusive use privilege. This imposed an express obligation on Excel which was integral to the lease and represented a dependent covenant. The jury specifically found that Excel's breach of the exclusive use provision in Section 6.3 of the lease was material. Excel's contention that the jury's verdict on this issue is irrelevant to

the determination that Section 4.5 makes Excel's obligations under the lease independent covenants not only ignores the verdict, which is now final, but ignores the plain language of the lease, expressly imposing the duty on Excel to protect the exclusive use right.

### 2. *Waiver of Section 4.5.*

■ Flagship argues that Excel waived the defense of Section 4.5 by not presenting the issue to the jury and that Excel has the burden of establishing that Section 4.5 operated as a waiver of the right to rescind by clear and convincing evidence.

Excel rejoins that the Ninth Circuit "specifically ruled that § 4.5 was not an affirmative defense (affirming this Court's earlier ruling)." The Ninth Circuit, in reversing the finding of judicial estoppel, ruled that there was no evidence that the Court relied on any inconsistent statement by Excel: "Excel had no legal obligation to pursue a general legal argument against rescission prior to its more narrow arguments because the argument regarding limitation of remedies available under the contract is not an affirmative defense under Fed.R.Civ.P. 8(c)."

In the November 19, 2004 Memorandum Decision, 40:3–41:26, the Court addressed Flagship's contention that Sections 4.5 and 22.25 were affirmative defenses that were waived by Excel by failure to raise them in the Answer. The discussion in the November 19, 2004 Memorandum Decision is limited to contractual limitation of damages clauses:

With respect to contractual limitations on damages in a contract dispute, the defense is contained in the cause of action itself. Both sides had full access to the Lease (38 pages long) and are presumed to have examined it carefully. There is no danger of unfair surprise by assertion of this defense.

This discussion is limited to Section 22.25 of the Lease; it does not address Section 4.5 as an affirmative defense. Excel relies on the Ninth Circuit's ruling to assert that it had no burden of proof "with respect to this issue or other purported 'waiver' issues proffered by Plaintiffs." Excel contends that the burden is on Flagship to prove their entitlement to rescission.

Flagship's waiver argument is premised on the contention that application of Section 4.5 to bar rescission is Excel's affirmative defense. The Ninth Circuit's ruling resolves Flagship's position.[2]

Excel previously argued that "[i]n § 4.5 Plaintiffs have expressly waived the right to 'quit, terminate or surrender' the Lease 'except as otherwise expressly set forth herein' and there is not 'otherwise' in the Lease" and that Section 4.5 precludes rescission " '. . . by reason of . . . any restriction or prevention of or interference with any use of the Premises."

Flagship argues that Section 4.5's plain language reveals that it does not constitute a waiver of rescission. Flagship notes that the term "rescission" does not appear in Section 4.5 and cites California case law in support of its contention that the terms "quit," "terminate," or "surrender" are not synonyms for rescission and have distinct unrelated meanings within the context of the Lease.

Flagship invokes principals of contract interpretation.

 In California, "the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this intention by determining what the parties meant by the words they used." *Pacific Gas and Electric Co. v. G.W.*

*Thomas Drayage & Rigging Co., Inc.*, 69 Cal.2d 33, 38, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). "The precise meaning of any contract ..., depends upon the parties' expressed intent, using an objective standard." As explained in *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18–19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995):

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Civ.Code, § 1636.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [*Id.*, § 1639.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation ... A [contract] provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable ... But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract ... Courts will not strain to create an ambiguity where none exists.

"Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions' " and a court " 'must avoid an interpretation which will make a contract extraordinary, harsh, unjust, of inequitable.' " *ASP Properties Group v. Fard,*

---

**2.** The Ninth Circuit's ruling makes unnecessary any discussion of Flagship's contention that Excel waived the right to contest rescission by failing to present the issue to the jury and establishing that Section 4.5 operated as a waiver of rescission by clear and convincing evidence.

*Inc.*, 133 Cal.App.4th 1257, 1269, 35 Cal. Rptr.3d 343 (2005):

> Section 1643 provides: 'A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties.' In the event other rules of interpretation do not resolve an apparent ambiguity or uncertainty, 'the language of a contract should be interpreted most strongly against the party who cause the uncertainty to exist.' (§ 1654).

*Id.*

Flagship argues that, applying these rules of contract interpretation, Section 4.5 cannot be reasonably interpreted as a waiver of its right to rescind or as precluding rescission in any way. Flagship contends that Excel waived the right to argue that extrinsic evidence should be considered in interpreting the Lease because it did not present extrinsic evidence at trial concerning the meaning of the Lease or request findings of fact by the jury through special interrogatories.

Flagship contends that the plain language of Section 4.5 does not constitute a waiver of its right to rescind.[3]

Flagship asserts the word "terminate" is not synonymous with "rescission." Flagship cites *Welles v. Turner Entertainment Co.*, 503 F.3d 728 (9th Cir.2007). In *Welles*, the daughter of Orson Welles sought a declaratory judgment that she owned the copyright and home video rights to "Citizen Kane," an accounting of royalties, and for alleged breach of contract and unfair business practices. In pertinent part, the Ninth Circuit ruled:

> As noted above, the Exit Agreement stated that it was 'the mutual desire of

the parties to terminate and cancel' their prior agreements. Beatrice Welles argues that this language rescinded the parties' prior agreements and thus returned any right Orson Welles and Mercury had in the *Citizen Kane* motion picture to them. However, under California law, it seems that 'terminate' and 'cancel' mean something different from 'rescind':

> > The words "terminate," "revoke," and "cancel," . . . all have the same meaning, namely, the abrogation of so much of the contract as might remain executory at the time notice is given, and must be sharply distinguished from the word "rescind," . . . which conveys a retroactive effect, meaning to restore the parties to their former position.

> *Grant v. Aerodraulics Co.*, 91 Cal. App.2d 68, 204 P.2d 683 (1949). Thus, under California law, the Exit Agreement prospectively terminated and cancelled Orson Welles's right to royalties, but did not retroactively rescind RKO's copyright in the Citizen Kane motion picture unless RKO's copyright remained executory at the time of the Exit Agreement.

503 F.3d at 738. *See also Sanborn v. Ballanfonte*, 98 Cal.App. 482, 488, 277 P. 152 (1929).

Flagship argues that the Lease uses the word "terminate" consistently with its definition under California law as explained in *Sanborn* and *Grant*. Flagship refers to Section 18.2 of the Lease, captioned "Remedies:"

> (a) If an Event of Default shall occur, then, in addition to any other remedies available to Landlord at law or in equity, Landlord shall have the right to immedi-

---

**3.** Flagship requests the Court take judicial notice of various definitions of "rescission," or "rescind," "quit," "terminate" and "sur- render" set forth in various recognized dictionaries. *See* Doc. 501.

ately terminate this Lease, and to recover from the Tenant the following:

(1) the worth at the time of award of the unpaid Basic Rent, Additional Rent, and other sums owing by Tenant under this Lease (collectively 'Rent') which had been earned at the time of termination;

(2) the worth at the time of award of the amount by which the Unpaid Rent would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided.

. . . .

Flagship also refers to Section 6.4 of the Lease, captioned "Cessation of Business:"

If, after the Commencement Date, Tenant ceases business from the Premises for a period of one hundred eighty (180) days in any sixty (60) month period, Landlord shall have the option, by written notice to Tenant, to terminate this Lease as of the date set forth in such notice, which date shall not be earlier than thirty (30) days after the date of such notice. In the event Landlord elects to terminate this Lease as described above, this Lease shall be null and void and of no further force or effect on the date set forth for such termination, except that accrued but unpaid or unperformed obligations shall continue in effect; provided, however, that Landlord shall pay to Tenant on the effective termination date the unamortized cost incurred by Tenant for the construction of the improvements . . . .

Flagship refers to Section 15 of the Lease, captioned "Eminent Domain," and specifically Sections 15.1(a) ("In the event of a Total Taking of the Premises, the Lease shall terminate as of the date of the Taking . . .") and 15.2(a) ("If a Partial Taking results [in specified loss of parking or premises], then Tenant may, at Tenant's option, terminate this Lease in its entirety

as of the date of the Taking, in which case Landlord and Tenant shall be released from all further obligations and liability under the Lease . . ."). Flagship argues that interpretation of the word "terminate" in Section 4.5 to have a different meaning from these Lease provisions violates a basic premise of contract interpretation law. See E.M.M.I. Inc. v. Zurich American Ins. Co., 32 Cal.4th 465, 475, 9 Cal.Rptr.3d 701, 84 P.3d 385 (2004):

Accepting Zurich's interpretation would require that we give different meanings to the same term used in the same policy paragraph. This would run afoul of the rule of contract interpretation that the same word used in an instrument is generally given the same meaning unless the policy indicates otherwise.

Flagship also contends that the term "surrender" is not synonymous with "rescission." Flagship cites Scott v. Mullins, 211 Cal.App.2d 51, 55, 27 Cal.Rptr. 269 (1962):

A surrender is a yielding up of an estate for life or years to the reversioner or remainderman. A surrender yields the estate as distinguished from the possession and can be accomplished by express consent of the parties in writing, or by operation of law when the parties do something which implies they have consented.

"In landlord-tenant law, surrender exists when the tenant voluntarily gives up possession of the premises prior to the full term of the lease and the landlord accepts possession with intent that the lease be terminated." Black's Law Dictionary at 1444 (6th ed. 1990).

Flagship also contends that the term "surrender" in the Lease is used consistently with the definition under California law. Flagship refers to Section 22.5 of the Lease, captioned "Removal of Trade Fix-

tures During Term; Delivery at End of Term:"

> At any time during the Term of the Lease, Tenant may remove from the Premises any trade fixtures, machinery or equipment belonging to Tenant or third parties, provided Tenant shall repair any damage to the Premises caused by such removal. Upon expiration or earlier termination of this Lease, Tenant shall surrender the Premises ... and all portions thereof, to Landlord in good order, condition and repair ....

Section 22.11 of the Lease, captioned "Modification; Acceptance of Surrender," provides:

> No modification, amendment, termination or surrender of this Lease or surrender of the Premises or any portion thereof or of any interest therein by Tenant shall be valid or effective unless agreed to and accepted in a writing signed by Landlord, and no act by any representative or agent of Landlord, other than such a written agreement and acceptance by Landlord, shall constitute an agreement thereto or acceptance thereof.

Flagship argues that the term "quit" is not synonymous with rescission. Flagship cites *Grand Central Public Market v. Kojima,* 11 Cal.App.2d 712, 717, 54 P.2d 786 (1936). In *Kojima,* the landlord sent two three day notices to its tenant to pay rent or quit. The notices were ignored by the tenant and not acted upon by the landlord and expired by their terms. The landlord then sent the tenant a letter stating that if back rent was not paid, the landlord would commence suit to remove the tenant from the premises. The landlord sued the tenant, who quit the premises the day after the suit was filed. The tenant argued that it was not liable for the rent for the month of January, because the lease terminated when he quit the premises. The Court of Appeal ruled:

The lease is terminated only if the notice is acted upon by one of the parties. If the lessor had brought an unlawful detainer suit based upon the notices to quit, as they were framed in this case, then the court trying such unlawful detainer action would, upon a proper showing, have the undoubted right to decree a forfeiture of the lease ... Or, if the lessee within the three-day period specified in the notices had quit the premises, the respective lease would have been forfeited by agreement of the parties, since the lessee would be in the position of accepting lessor's offer to terminate the same ... Neither of these methods was followed or taken advantage of by either of the parties. When a lessor, as did the lessor in this case, claims or collects rent in an action, or otherwise, as the result of a legal proceeding, or otherwise, he waives his existing right to effect a termination.

Flagship relies on this to argue that the physical act of quitting the premises in and of itself does not effect termination of a lease: "Similarly, prohibition on 'quitting' the premises or a waiver of one's right to 'quit' the premises in no way could be interpreted as a waiver of one's right to rescind the lease."

Excel responds that Flagship's "hypertechnical argument" based on the definitions of "terminate," "surrender" or "quit" does not address the meaning of Section 4.5 as a whole. Excel asserts that Flagship's "convoluted argument boils down to the contention that because § 4.5 does not contain the word 'rescission,' rescission is not barred." Excel refers to the November 19, 2004 Memorandum Decision discussing the effect of rescission on contractual clauses at 41:18–44:25:

> With respect to § 4.5, Defendants cite a California Court of Appeals opinion

which states an alternate holding for denying rescission:

In plaintiffs' closing brief, not before, our attention was drawn to a provision contained in the subcontract agreement of plaintiff . . .: 'Subcontractor, in the event of any dispute or controversy with Contractor or any other subcontractor over any matter whatsoever, shall not cause any delay or cessation in or of Subcontractor's work or the work of any other subcontractor or of the Contractor but shall proceed under this Subcontract Agreement with the performance of the work required thereby.'

The quoted clause bound [Subcontractor] to finish its work regardless of any dispute with [Contractor]. In effect, the clause was an advance waiver of any right to rescind after partial performance. The net result of the clause was to make a breach of contract action the subcontractor's exclusive remedy. (*Nelson v. Spence*, 182 Cal.App.2d 493, 497 [6 Cal.Rptr. 312] . . .; 5A Corbin on Contracts, § 1227; 17A C.J.S., Contracts, § 422[1], p. 521, fn. 62.). Having committed itself to complete performance, [Subcontractor] was confined to the remedy and to make the scale of damages available to one who has completed his contract notwithstanding a breach by the other party—suit on the contract and recovery by the scale of damages which the law applies in such suits.

*B.C. Richter Contracting Co. v. Continental Casualty Co.*, 230 Cal.App.2d 491, 500–501 [41 Cal.Rptr. 98] (Cal.Ct.App. 1964). The provision waiving rescission was applicable even though it was first noticed on appeal after the completion of a bench trial. The cited provision does not mention the term 'rescission' and was found to be a valid waiver of that remedy. Its language is comparable to § 4.5.

The opinion upheld a valid anti-rescission clause, although rescission would void the effect of all other contractual clauses. The cases Plaintiff cite to the contrary do not negate the ability to waive the remedy of rescission. See e.g. *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 248 U.S. 334, 341 [39 S.Ct. 102, 63 L.Ed. 275] (1919) (subcontractor properly terminated contract when project was indefinitely delayed; 'the 11th paragraph of the sub-contract, providing: "The general contractors will provide all labor and materials not included in this contract in such manner as not to delay the material progress of the work, and in the event of failure so to do, thereby causing loss to the sub-contractor, agree that they will reimburse the sub-contractor for such loss," as applied to the facts of the case, imported an agreement by defendant to furnish the foundation in such manner that plaintiff might build upon it without delay, and was inconsistent with an implication that the parties intended that delays attributable to the action of the owner should leave plaintiff remediless'); *Gally v. Wynne*, 96 Cal. App. 145, 147 [273 P. 825] (Cal.Ct.App. 1929) (the contract provision in question stated 'In the event I violate any part of this agreement I agree to deduct $500 from the purchase price of $3500,' which is not an anti-rescission clause); *Dyer Bros. Golden West Iron Works v. Central Iron Works*, 72 Cal.App. 202, 207 [237 P. 386] (Cal.Ct.App.1925) (both parties breached the contract, voiding the liquidated damages clause).

The *B.C. Richter* holding cited by Defendants has been affirmed by more recent opinions. *See Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1455 (9th Cir.1996) ('Fosson admitted that he read and understood the Synch License provision in which he waived his right to rescind or terminate the agreement. . . .

Thus, Fosson has no right to rescind as a matter of law by virtue of his waiver.'); *Michel & Pfeffer v. Oceanside Properties, Inc.*, (1976) 61 Cal.App.3d 433, 442 [132 Cal.Rptr. 179] (specifically distinguishing *Guerini* as not mandating the performance of the contract, hence no waiver of rescission). These cases affirm the general enforceability of an anti-rescission clause.

Excel asserts that Flagship cites no authority that requires the explicit use of the term "rescission" in order to bar rescission as a remedy. Excel contends the result reached in *B.C. Richter* should apply here, "because all facets of rescission are barred by § 4.5."

Flagship replies that Excel's reliance on *B.C. Richter* and the November 19, 2004 Memorandum Decision is misplaced. Flagship contends that Excel argued to the Ninth Circuit on appeal that the Court correctly determined that Section 4.5 barred rescission based on *B.C. Richter* and the other cases cited in the November 19, 2004 Memorandum Decision. Excel contended on appeal that, had it not been for the finding of judicial estoppel, Section 4.5 would have prevented rescission. The Ninth Circuit remanded "so that the district court may determine in the first instance whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in this circumstances." Implicit in these instructions, Flagship contends, is a rejection of Excel's position that *B.C. Richter, Fosson,* and *Michel & Pfeffer* require, as a matter of law, that Section 4.5 be interpreted as a waiver of rescission."

Flagship argues that the circumstances of the cases on which Excel relies are different from the facts of this case: "[n]either *B.C. Richter, Fosson,* nor *Michel & Pfeffer* involved a landlord's undisputed material breach of a 25 year ground lease a year after the lease commenced."

In *Fosson* a composer brought a copyright infringement action against movie producers and a financing company. The District Court granted summary judgment for defendants. On appeal, the Ninth Circuit addressed the circumstances under which a subsequent breach of an express license, which may constitute grounds for rescission, can give rise to a suit for infringement by the licensor. Flagship argues that *Fosson* is distinguishable because there, the remedies limitation clause specifically provided that the licensor "shall not have any right to terminate or rescind this Agreement" and because Fosson admitted that he read and understood the agreement. Flagship notes that Section 4.5 does not mention the term "rescission" and contends that there is no testimony in this action regarding any party's understanding of Section 4.5.

In *Michel & Pfeffer,* a subcontractor on a building project brought an action against the contractor, the contractor's surety, and the property owners for payment on a bond, foreclosure of a mechanic's lien, and a common count based on work performed. Flagship contends: "These circumstances alone point to why remedies' limitation clauses in construction contracts may be generally enforced, as the subcontractor has both the security of the bond and mechanics lien statutes to secure payment for his work done." Flagship asserts that also at issue in *Michel & Pfeffer* was a delay of the subcontractor's work caused by the contractor. The contract provided that an extension of time for delays "shall be the sole remedy of Subcontractor." Flagship argues that *Michel & Pfeffer* is distinguishable because Section 4.5 does not provide for any sole remedy for the landlord's breach and does not reference or otherwise pertain to the

landlord's obligation to honor Flagship's exclusive use rights.

*B.C. Richter* involved actions by subcontractors on the prime contractor's surety bond for quantum meruit recovery to be measured by the reasonable value of unpaid labor and materials. The trial court ruled that the subcontractors' recovery was limited to the unpaid remainder of the contract price. On appeal, the subcontractors argued that the breaches and defaults by the contractor entitled them to forego the contract price as the strict measure of liability, permitting recovery by the more generous scale of quantum meruit or reasonable value. The Court of Appeal ruled:

> Plaintiffs' thesis rests upon misconceptions of contract law and misuse of the phrase 'quantum meruit.' The general rule in California is " '. . . one who has been injured by a breach of contract has an election to pursue any of three remedies, to wit: 'He may treat the contract as rescinded and may recover upon a quantum meruit so far as he has performed; or he may keep the contract alive, for the benefit of both parties, being at all times ready and able to perform; or, third, he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing.' " . . . When, after partial performance, the innocent party elects to disaffirm or rescind, there is no longer any contract which conclusively fixes a limit upon his recovery; hence, it is said, he may sue upon a quantum meruit as if the special contract had never been made and may recover the reasonable value of the services performed, even though recovery exceeds the contract price . . . .

> If the innocent party chooses to rescind, he must do so promptly upon discovery of the breach . . . He may not wait to see whether the contract turns out to be profitable or unprofitable, good or bad . . . .

> Where his performance is not prevented, the injured party may elect instead to affirm the contract and complete performance. If such is his election, his exclusive remedy is an action for damages . . . Affirmation of the contract, on the one hand, and rescission and restitution on the other, are alternative remedies. Election to pursue one is a bar to invoking the other . . . .

> In plaintiffs' closing brief, not before, our attention was drawn to a provision contained in the subcontract agreement of plaintiff B.C. Richter Contracting Company, but not in the subcontract of R. & E. Materials Company: 'Subcontractor, in the event of any dispute or controversy with Contractor or any other subcontractor over any matter whatsoever, shall not cause any delay or cessation in or of Subcontractor's work or the work of any other subcontractor or the Contractor but shall proceed under this Subcontract Agreement with the performance of the work required thereby.'

> The quoted clause bound Richter to finish its work regardless of any dispute with Hayes–Cal Builders. In effect, the clause was an advance waiver of any right to rescind after partial performance . . . Having committed itself to complete performance, Richter Contracting was confined to the remedy and to the scale of damages available to one who has completed his contract notwithstanding a breach by the other party— suit on the contract and recovery by the scale of damages which the law applies in such suits . . . .

> On the assumption that Hayes–Cal was guilty of hindrances and defaults amounting to a breach of contract conditions, the other plaintiff, R. & E. Materi-

als Company, had an election to rescind promptly or to stand on its contract and continue performance. Choice of the first alternative would have permitted R. & E. Materials to sue in quantum meruit for the reasonable value of partial performance, less any sums paid. The joint venture did not choose that alternative. The trial court correctly concluded that it lost all right to rescind by failing to do so promptly after the cessation of progress payments. It is equally accurate to say that it elected not to repudiate the subcontract, but to affirm it and continue performance. Having chosen the second alternative, it was then barred from repudiation and pursuit of reasonable value.

Thus, when both plaintiffs argue on appeal for 'quantum meruit' unlimited by the contract price, they speak in terms not available to them. Their remedy was that imposed upon them, in the one case, by the contract and in the other by their election to perform: to sue for the unpaid balance of the contract price plus extra costs caused by hindrances and delay.

230 Cal.App.2d at 499–501, 41 Cal.Rptr. 98.

Flagship asserts that the court in *B.C. Richter* did not find that the remedies provision barred rescission outright. *B.C. Richter* ruled that the "clause bound Richter to finish its work regardless of any dispute with Hayes–Cal Builders" and that "clause was an advance waiver of any right to rescind after partial performance." 230 Cal.App.2d at 501, 41 Cal.Rptr. 98. Flagship contends that *B.C. Richter* does not support interpreting Section 4.5 as a waiver of Flagship's right to rescind, particularly in light of the fact that in *B.C. Richter*, there was no material breach by the other contracting party that thwarted performance. Flagship asserts:

> Significantly, B.C. Richter had *completed the contract* and then sought to re-

scind the contract. (*Id.* at 502, 41 Cal. Rptr. 98.) The court found that under these circumstances, the subcontractor had waived its right to rescind.

Flagship cites *Seaboard Surety Co. v. United States*, 355 F.2d 139, 143 (9th Cir. 1966), where the Ninth Circuit, in discussing *B.C. Richter*, stated that "[t]he subcontractors had a right to rescind after the cessation of certain progress payments, but elected to proceed with contract and completed performance."

Flagship also cites *Barton Properties, Inc. v. Superior Gunite Co.*, 2006 WL 541025 at *7 (Cal.Ct.App.2006).

The dispute in *Barton Properties* was over paragraph 35 of a construction contract:

> 35. In the event of a dispute between the parties as to performance of the work, the interpretation of this contract, extra work, delay, disruption, or payment or nonpayment for work performed, the parties shall attempt to resolve the dispute by negotiation. If the dispute is not resolved, *Contractor agrees to Continue the work diligently to completion and will neither rescind nor stop the progress of the work, but will submit such controversy to determination by a court of competent jurisdiction after the project has been completed.*

*Id.* at *5. The Court of Appeal, citing California Civil Code § 1511 and *Peter Kiewit Sons' Co. v. Pasadena City Junior College*, 59 Cal.2d 241, 28 Cal.Rptr. 714, 379 P.2d 18 (1963), that an owner who is a party to a construction contract is a creditor, ruled:

> We conclude that where a general contractor (Barton Properties) *materially* breaches a contract so as to delay or prevent the performance of the subcontract (Superior Gunite) the subcontractor is not foreclosed from refusing to

perform and rescinding the contract by reason of a contractual provision, such as paragraph 35, which requires a contractor not to rescind the contract or stop working but instead to 'continue the work diligently to completion' and then 'submit [any] controversy [regarding]' 'performance of the work, the interpretation of this contract, extra work, delay, disruption, or payment or nonpayment for work performed' 'to determination by a court of competent jurisdiction after the project has been completed.' A contrary conclusion would impermissibly conflict with the controlling plain language of section 1511, paragraph 1 .... Barton Properties acknowledges the existence of this conflict. Its position is that the 1965 amendment to section 1511, paragraph 1 'added [a] clause permitting ... provisions' such as paragraph 35.

We note Barton Properties has cited no applicable authority in support of its position that contractual provisions such as paragraph 35 are authorized under section 1511, paragraph 1. Its reliance is misplaced on *B.C. Richter Contracting Co. v. Continental Cas. Co.* (1964) 230 Cal.App.2d 491 [41 Cal.Rptr. 98] ... and *Michel & Pfeffer v. Oceanside Properties, Inc.* (1976) 61 Cal.App.3d 433 [132 Cal.Rptr. 179]. Neither case addressed section 1511, paragraph 1, much less its impact on a contractual provision such as paragraph 35 ....

*Id.* at *6. The Court of Appeal then addressed Barton Properties' contention that it was prejudiced by a jury instruction that it contended negated paragraph 35. In so ruling, the Court of Appeal stated:

And *B.C. Richter* is factually inapplicable and thus fails to support Barton Properties's position. As discussed above, *B.C. Richter* did not involve section 1511, paragraph 1 or its applicability to paragraph 35 or a similar contract provision, and its comments regarding such a provision were dicta. The court did not discuss whether section 1511, paragraph 1 rendered unenforceable a contract provision like paragraph 35. In [*B.C. Richter*], two subcontractors sued in quantum meruit for an amount greater than the contract price on the theory they were entitled to rescind the contract ... Their exclusive remedy, however, was for breach of contract because they affirmed the contract by completing their performance ... The *B.C. Richter* court characterized a clause in the contract of one subcontractor, which required it to complete its performance notwithstanding any dispute with the contractor, to be an 'advance waiver of any right to rescind after partial performance[, which meant] a breach of contract action [was] the subcontractor's exclusive remedy.' ... But this was dicta because the trial court did not make any factual findings that the contractor had hindered the subcontractor's performance, and the subcontractor had performed completely.

*Id.* at *7.

*Barton Properties* is not controlling. California Civil Code § 1511 provides:

The want of performance of an obligation, or an offer of performance, in whole or in part, or any delay therein, is excused by the following causes, to the extent to which they operate:

1. When such performance or offer is prevented or delayed by the act of the creditor, or by the operation of law, even though there may have been a stipulation that this shall not be an excuse; however, the parties may expressly require in a contract that the party relying on the provisions of this paragraph give written notice to the other party or parties, within a reasonable time after the occurrence of the event excusing performance, of an intention to claim an

extension of time or of an intention to bring suit or any other similar or related intent, provided that the requirement of such notice is reasonable and just . . . .

As Excel notes, Flagship and Excel were tenant and landlord. Flagship makes no showing or argument that it was a creditor within the meaning of Section 1511.

The rules of contract construction support Flagship's position that Section 4.5 is not a waiver of rescission; the unavailability of rescission is never mentioned in Section 4.5 and no evidence was presented that the parties intended that rescission of the lease be precluded based on Excel's material breach of the lease. Moreover, *B.C. Richter* and related cases contain continual performance obligations, despite an event of breach, which is the basis for a waiver of the right to rescind. Section 4.5 is expressly subject to exceptions "otherwise expressly set forth herein." Section 6.3 is such an express exception.

### 3. *Rescission Voided Entire Lease.*

Flagship argues that, because it rescinded the Lease, the entire Lease, including Section 4.5, is extinguished and cannot be enforced.

■ California Civil Code § 1688 provides that "[a] contract is extinguished by rescission." "Rescission of a contract must be of the contract as a whole and not in part. It is the undoing of a thing and means that both parties to the contract are entirely released as if it had not been made." *Douglass v. Dahm,* 101 Cal. App.2d 125, 128, 224 P.2d 914 (1950). Flagship refers to the November 19, 2004 Memorandum Decision at 41:28–42:17, where the Court discussed the effect of rescission on contractual clauses:

Plaintiffs are correct in stating that rescission would void ordinary contractual clauses such as § 22.25. Once a contract is rescinded, all its provisions cease to have effect. *See Larsen v. Johannes,* 7 Cal.App.3d 491, 501 [86 Cal.Rptr. 744]

(Cal.Ct.App.1970) (citing *Lemle v. Barry,* 181 Cal. 1, 5 [183 P. 150] (Cal.1919)). ('When a contract is rescinded, it ceases to exist. If the action to rescind or an action based on an alleged rescission or abandonment is successful, the contract is forever ended and its covenants cannot thereafter be enforced by any action'). In an unpublished state court opinion, an analogous question was posed: 'The issue presented is elemental—may a defendant resist an action for rescission by relying on a liquidated damages provision of the contract the plaintiff is seeking to rescind? The answer is equally simple—no.' *BTS, Inc. v. Sonitrol Corp. of Contra Costa,* No. A093591, 2002 WL 234889 (Cal.App. 1 Dist., Feb. 19, 2002) ('rescinded contract is an extinguished contract meaning that it has ceased to exist and none of its provisions can be enforced by any party').

Excel responds that Flagship's position evades "the point entirely: § 4.5 bars rescission from the outset, so what *might* happen *if* Plaintiffs *could* rescind is meaningless." Excel asserts that Flagship's "circular argument" was rejected by the Court in the November 19, 2004 Memorandum Decision discussing the effect of rescission on contractual clauses quoted above. This is belied by the express exceptions included in Sections 4.5 and 6.3, which suspend the Lessor's remedies upon occurrence of the condition of the exception; to wit, Excel's violation of Flagship's exclusive use rights.

### 4. *Context of Lease as a Whole Does Not Support Interpreting Other Portions of Section 4.5 as Waiver of Right to Rescind.*

Flagship argues that, looking to the Lease as a whole, Section 4.5 cannot be interpreted as a waiver of the right to rescind. Flagship notes that Section 4 of

the Lease is captioned "Rent." The provisions of Section 4 are specifically directed at the Tenant's obligations to pay rent: Section 4.1 sets out the preliminary rent Flagship was obligated to pay from the time it entered into the Lease until the Golden Corral Restaurant opened for business; Section 4.2 sets out the basic rent after the restaurant opened; Section 4.3 provided for the amount of rent during the five-year option periods; Section 4.4 obligated Flagship to pay additional rent on demand; Section 4.6 provided Landlord the right to assign rent payments. Flagship argues that within the context of these provisions, Section 4.5, captioned "Triple Net Lease," provides what Excel would net from the rental payments. Flagship cites 6 Matthew Bender, California Real Estate Law & Practice, § 154.10[1], that a triple net lease provision assures the Landlord that "the tenant pays the taxes, the insurance, costs of repair, and costs of maintenance." Flagship argues that Section 4.5 is a standard triple net lease provision which entitles the Landlord to rent net of these costs and "is essentially a financing device that gives the tenant the advantages of ownership without the investment of capital or direct obligation under a deed of trust and gives the owner of the property a return of his or her investment without the active responsibilities of investment management." *Id.*

Flagship refers to the portion of Section 4.5 providing:

*Except as otherwise expressly set forth in this Lease,* this Lease shall continue in full force and effect, and the obligations of Tenant hereunder shall not be released, discharged or otherwise affected, by reason of any of the following: (a) any damage to or destruction of the Premises or any portion of either or any Taking of the Premises or any portion of either; (b) any restriction or prevention of or interference with any use of the Premises or any portion of either; or (c) any other occurrence whatsoever, whether similar or dissimilar to the foregoing, in each case, whether or not Tenant shall have notice or knowledge of any of the foregoing. [Emphasis added].

Flagship argues that nothing in this language can be interpreted as a waiver of Flagship's right to rescind:

On its face, the language deals with physical interference or restrictions and is facially not applicable to the material breach of the lease at issue in this case. By definition, the provision provides that the lease would continue in force notwithstanding the occurrence of a condition subsequent. Specifically, there is no language contained within Section 4.5 that could reasonably be interpreted as a limitation on a tenant's right to rescind.

Flagship argues that the purpose of the provision in Section 4.5 that

Tenant's Basic Rent and Additional Rent shall be absolutely net to Landlord, so that this Lease shall yield to Landlord the full amount of the installments of Basic Rent and Additional Rent throughout the Term, and shall be paid without assertion of any counterclaim, set off, deduction or defense and without abatement, suspension, deferment, diminution, reduction or refund of any kind, *except as expressly set forth herein*, [emphasis added]

is "to preclude a tenant from interposing a counterclaim in any action or proceeding brought by the landlord for rent, or for possession based on nonpayment," quoting 1 Friedman on Leases § 5:1.2[A] (5th ed. 2009). Flagship asserts that "[t]his interpretation flows from the language of the sentence, which uses the words, 'counterclaim, set off, deduction, or defense,' and does not use the words typically associated

with offensive action, such as 'cause of action' 'claims' etc." Flagship argues that this portion of Section 4.5 should be contrasted with Section 12.1, captioned "General Indemnity:"

Tenant shall protect, indemnify, defend and hold Landlord ... harmless from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, judgments, costs and expenses ... incurred by or asserted against Landlord ... during the Term hereof, arising in connection with or resulting from (a) this Lease; (b) any accident or injury to or death of persons or loss of or damage to property occurring on or about the Premises or any portion thereof; (c) any use or condition of the Premises or any portion thereof; (d) any failure by Tenant to perform or comply with any terms of this Lease, or (e) any negligence, willful misconduct or tortious act or omission on the part of Tenant or any Subtenant ... If any action, suit or proceeding is brought against Landlord ... by reason of any of the foregoing, Tenant, upon Landlord's request, shall, at Tenant's sole cost and expense, defend such action, suit or proceeding with counsel designated by Landlord. The obligations of Tenant under this Paragraph shall survive the expiration or earlier termination of this Lease.

Flagship, noting that Section 12.1 uses the terms "any and all liabilities, obligations, claims, damages, penalties, causes of action, judgments, costs and expenses," argues that "[u]nder the rule of construction that the expression of one thing is the exclusion of another, and in light of Section 4.5's use of the words typically associated with defenses, such as 'set off, deduction, defense, abatement, counterclaim' etc., this sentence cannot be interpreted as applying to offensive claims that Flagship would have against Defendants for their breach of the Lease." Flagship cites *Steven v. Fidelity & Cas. Co. of New York*, 58 Cal.2d 862, 870, 27 Cal.Rptr. 172, 377 P.2d 284 (1962):

The crucial issue resolves into whether the limitation of that extension to 'land conveyances' sufficiently overcomes the normal expectation that coverage would extend to *any reasonable form of substitute conveyance.* The clause clearly does not specifically exclude substitute emergency aircraft; it does not mention nonland conveyances at all. An inference of such noncoverage could arise only with the aid of the rule of construction *expressio unius est exclusio alterius:* i.e., that mention of one matter implies the exclusion of all others.

We do not believe the application of the maxim can resolve the present case. The maxim serves as an aid to resolve the ambiguities of a contract. If we invoke the *expressio unius* approach, we must necessarily thereby recognize the ambiguity of the contract; in that event other legal techniques for the resolution of ambiguities, including the rule that they should be interpreted against the draftsman, also come into play. Thus *McNee v. Harold Hensgen & Associates* (1960) 178 Cal.App.2d 881, 3 Cal.Rptr. 377 holds that if the applicability of a contract provision can be determined only by use of the maxim *expressio unius,* the contract is ambiguous, and extrinsic evidence is therefore admissible to prove the intent of the parties.

Flagship further asserts that the "and shall be paid" clause of Section 4.5 refers only to the payment of rent by Flagship and, standing alone, cannot be construed as a waiver of any right to rescind the Lease based on Excel's breach of the exclusive use provision.

Finally, Flagship refers to the portion of Section 4.5: "Under no circumstances whether now existing or hereafter arising,

or whether beyond the present contemplation of the parties, shall Landlord be required to make any payment or refund of any kind whatsoever or be under any obligation or liability hereunder, except as expressly set forth herein." Flagship argues that this portion of Section 4.5 is not a waiver of the right to rescind by the Tenant for a material breach of the Lease:

> This sentence of Section 4.5 plainly sets out the obligations of the Landlord to refund or pay Flagship 'hereunder' i.e., *under the Lease,* but has no facial applicability to any claims Flagship may have against the Landlord for its breach of its obligations under the Lease.

Flagship again notes that this portion of Section 4.5 does not use the terms damages, judgments, causes of action, or other similar language used in the indemnity section, Section 12.1. Flagship refers to Section 15.1(a), which provides that, in the event of a total Taking of the Premises, "this Lease shall terminate as of the date of the Taking and the Basic Rent and Additional Rent theretofore paid or then payable shall be apportioned and paid up to the date of termination and any unearned Basic Rent or Additional Rent shall be refunded to Tenant." Flagship argues that the "payment or refund" sentence in Section 4.5 cannot be interpreted as waiving Flagship's right to sue Excel for rescission of the Lease based on Excel's material breach of the exclusive use provision. Citing *Runyan v. Pacific Air Industries, Inc.,* 2 Cal.3d 304, 310–319, 85 Cal. Rptr. 138, 466 P.2d 682 (1970), Flagship asserts that, in the face of rescission, the plaintiff is awarded restitution damages, not a refund.

Excel responds that the whole of the Lease is consistent with its position that Flagship's obligations are separate and independent covenants and that Section 4.5 otherwise bars rescission. Excel contends that Flagship attempts to skirt the legal effect of independent covenants and reads the language of Section 4.5 "so technically and narrowly that the results are ridiculous." Excel refers to Section 14.3 of the Lease, in the section captioned "Damage by Fire or Casualty:"

> Except as expressly provided in this Lease, Tenant's obligation to make payments of Basic Rent, Additional Rent and all other charges hereunder, except to the extent Landlord is actually reimbursed by the proceeds of rental value insurance, and to perform all its covenants and conditions shall not be affected by any damage or destruction of the Premises or the improvements or replacements thereof. Tenant hereby waives the provisions of any statute or law now or hereafter in effect which is contrary to the foregoing obligation of Tenant, or which relieves Tenant therefrom.

Excel asserts that, "[f]ollowing Plaintiffs' absurd logic, Plaintiffs could rescind the entire Ground Lease in the event of damage to its Improvements, because the word 'rescission' is not specifically stated."

However, for the reasons stated *supra,* Section 4.5 cannot be construed to preclude rescission because of Excel's material breach of the lease. Section 4.5 by its terms provides that the tenant's obligation to pay rent under the lease is an independent covenant. Section 4.5 does not refer in any way to the landlord's obligations to the tenant under the lease. The jury specifically found that Excel's breach of the exclusive use provision in Section 6.3 of the lease was material.

5. *Defendants' Conduct and Performance Shows They Never Interpreted Section 4.5 as Preventing the Remedy of Rescission.*

 ■ Flagship argues that Defendants' conduct with respect to Section 4.5 "is not reasonably interpreted as a waiver of rescission."

Flagship refers to the "principle of practical construction." Flagship cites *Crestview Cemetery Ass'n v. Dieden,* 54 Cal.2d 744, 753–754, 8 Cal.Rptr. 427, 356 P.2d 171 (1960):

> That the actions of the parties should be used as a reliable means of interpreting an ambiguous contract is, of course, well settled in our law ... 'The acts of the parties under the contract afford one of the most reliable means of arriving at their intention; and, while not conclusive, the construction thus given to a contract by the parties before any controversy has arisen as to its meaning will, when reasonable, be adopted and enforced by the courts.' ... 'The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention ....'
>
> ...
>
> This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent.
>
> Appellants correctly claim that this doctrine of practical construction can only be applied when the contract is ambiguous, and cannot be used when the contract is unambiguous. That is undoubtedly a correct general statement of the law ... But the question involved in such cases is ambiguous to whom? Words frequently mean different things to different people. Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean. Thus, even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced. In such a situation the parties by their actions have created the 'ambiguity' required to bring the rule into operation. If this were not the rule the courts would be enforcing one contract when both parties have demonstrated that they meant and intended the contract to be quite different.

Flagship argues that, under the principle of practical construction, the Court can consider Excel's conduct after Flagship's notice of rescission in April 2001, until the dispute regarding Section 4.5 arose, after the jury's verdict was returned in Flagship's favor. Flagship argues that, underlying the rule of practical construction is the recognition that a party may modify its conduct with respect to the disputed issue following a disagreement. Flagship asserts that, given Excel's position that Section 4.5 expressly bars rescission, it is logical to expect that Excel would have asserted this bar at the time the parties' dispute arose in 2000 and again in response to the notice of rescission. Excel never contended that Section 4.5 constituted a waiver of Flagship's right to rescind at any time before this litigation commenced or at any time before this case was submitted to the jury: "Clearly, Defendants' assertion that Section 4.5 bars rescission was an afterthought."

Excel responds that Flagship fundamentally misunderstands the principle of practical construction, which focuses on how the parties behaved before any controversy erupted:

If this doctrine has any application here, it supports Excel's position, not Plaintiffs.' This is so because Excel believed that the Four Seasons' use would not violate Plaintiffs' lease and Excel acted accordingly. Obviously, from Excel's point of view at the time, the remedy of rescission was irrelevant because there was no breach.

It is Excel that misinterprets the doctrine. Excel did not assert that Flagship had no contractual right to rescind the lease and was limited to damages when Flagship gave notice of rescission. Excel only made this contention after the jury had ruled that Excel had materially breached the exclusive use provision of the lease. If Excel truly believed that rescission was not an available remedy, Excel would have so advised Flagship when Flagship gave notice of rescission and sought rescission as a remedy in its complaint. If Excel had believed in the bar defense, its conduct is further inconsistent as it never brought, before or during trial, a dispositive motion on this issue.

### 6. *No California Case has Upheld Advance Waiver of Rescission for Material Breach.*

In response to Excel's contention that Section 4.5 is an "express" waiver of Flagship's right to rescind the Lease for Excel's material breach and citing *Medico–Dental Bldg. Co. of Los Angeles v. Horton & Converse, supra,* 21 Cal.2d at 434, 132 P.2d 457, Flagship asserts that a material breach occurs when the breach "will defeat the entire object of the lessee in entering into the lease." Flagship contends that the California Supreme Court articulated the concept of a material breach:

> While consistent with practical considerations, it is said that a breach of a contractual right in a trivial or inappreciable respect will not justify rescission of the agreement by the party entitled to the benefit in question, a default in

performance will not be tolerated if it is so dominant or pervasive as in any real or substantial measure to frustrate the purpose of the undertaking ... But where, as here, the covenant of the lessor is of such character that its breach will defeat the entire object of the lessee in entering into the lease, such as rendering his further occupancy of the premises a source of continuing financial loss incapable of satisfactory measurement in damages, it must be held that the covenant goes to the root of the consideration for the lease upon the lessee's part.

*Id.* at 433–434, 132 P.2d 457. Flagship asserts that Excel's contention that Flagship waived the right to rescind the agreement based on Excel's breach of the exclusive use provision would "defeat the entire object of the lessee in entering into the lease." Flagship refers to Marvin Reiche's trial testimony that he would not have entered into the Lease but for the exclusive use granted to Flagship pursuant to the exclusive use provision.

*See discussion infra* re Flagship's argument that there is no authority indicating that California Courts would interpret Section 4.5 as an advance waiver of rescission for a material breach of a lease, specifically, the *B.C. Richter Contracting Co.* and *Michel & Pfeffer* decisions.

Flagship further argues that interpreting Section 4.5 as preventing rescission for a material breach is contrary to public policy reflected in California law. Flagship cites *Philippine Airlines, Inc. v. McDonnell Douglas Corp.,* 189 Cal.App.3d 234, 237–238, 234 Cal.Rptr. 423 (1987):

> [C]ontractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the party seeking to limit its liability for negligence.

'The language of an agreement in order to exclude liability for negligence must be "clear and explicit" and "free of ambiguity or obscurity." ... The law generally looks with disfavor on attempts to avoid liability or to secure exemption from one's own negligence ... The law requires exculpatory clauses to be strictly construed against the party relying on them ....

Flagship also cites *Queen Villas Homeowners Ass'n v. TCB Property Management*, 149 Cal.App.4th 1, 5, 56 Cal.Rptr.3d 528 (2007):

Where a two-party contract purportedly releases one side from liability to the other (e.g., *Saenz v. Whitewater Voyages, Inc.* (1991) 226 Cal.App.3d 758, 276 Cal.Rptr. 672 [contract in which plaintiff's decedent expressly assumed the risk of white water rafting and relieved defendant rafting company of liability]), courts must look for clear, unambiguous and explicit language not to hold the released party liable. As the *Saenz* court nicely put it: 'Everyone agrees that drafting a legally valid release is no easy task. Courts have criticized and struck down releases if the language is oversimplified, if a key word is noted in the title but not the text, and if the release is too lengthy or too general, to name a few deficiencies ... However, we must remember that "[t]o be effective, a release need not achieve perfection ... It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence." '

Flagship asserts that the law of indemnity provisions is similar. *See Prince v. Pacific Gas and Electric Co.*, 45 Cal.4th 1151, 1158, 90 Cal.Rptr.3d 732, 202 P.3d 1115 (2009):

In the context of noninsurance indemnity agreements, if a party seeks to be indemnified for its own active negligence, or regardless of the indemnitor's fault, the contractual language on the point 'must be particularly clear and explicit, and will be construed against the indemnitee.'

Flagship notes that California law bars the prior release of liability for gross negligence, *City of Santa Barbara v. Superior Court*, 41 Cal.4th 747, 758, 62 Cal.Rptr.3d 527, 161 P.3d 1095 (2007), or for negligent misrepresentations, *Blankenheim v. E.F. Hutton Co.*, 217 Cal.App.3d 1463, 1473, 266 Cal.Rptr. 593 (1990). Relying on this authority, Flagship contends:

As the foregoing reveals, California has a strong public policy of requiring exculpatory clauses, to the extent they are valid, to clearly and unequivocally advise the exculpating party of exactly what conduct of Defendants is subject to exculpation. As in the context of indemnity and releases, rescission can occur for a variety of circumstances. In this regard, Civil Code § 1689 recognizes a range of circumstances under which a contract may be rescinded, from a consensual rescission to unilateral rescissions based on mistake, fraud or material failure of consideration ... The California Supreme Court has noted the range of circumstances upon which rescission could be based. (*See Runyan*, 2 Cal.3d [at] 317 [85 Cal.Rptr. 138, 466 P.2d 682]). As such, there is a continuum of circumstances under which a contract may be rescinded from nonculpable and to culpable (i.e. a material breach) conduct.

Flagship argues that Section 4.5 "does not remotely meet the standard of a clear and unequivocal exculpatory provision" because "nothing in the language of Section 4.5 specifically mentions excusing the Defendants from a future material breach." Moreover, under this principle, given the

prolixity of remedies court to be barred in Section 4.5, if Excel truly sought to bar the right of rescission, if could have said so.

Flagship's public policy analysis is inapposite. Section 4.5 is not a release or an indemnity provision. Excel is arguing that Section 4.5 bars Flagship from the remedy of rescission even though Excel breached the Lease. No case is cited by Flagship that suggests that California Courts strike down such a provision or interpretation on the ground that it violates a fundamental public policy of California.

### 7. *Unconscionable.*

█ Flagship argues that interpreting Section 4.5 as a waiver of rescission would make Section 4.5 unconscionable as applied.

In the November 19, 2004 Memorandum Decision, the Court addressed Flagship's contention that Sections 4.5 and 22.25 are unconscionable as applied:

> E. *Unconscionability.*
> Plaintiffs claim that the Lease clauses are 'unconscionable in light of the context of this transaction' and cannot be applied ... Defendants cite *Markborough California, Inc. v. Superior Court* for the proposition that a limitation of liability provision is enforceable ... That case also says that 'although these provisions generally have been upheld as reasonable and valid, nonetheless, because they do in fact exculpate or insulate a party, at least to a certain extent, from liability for his or her own wrongful or negligent acts ... such provisions may be declared unenforceable if the provision is unconscionable or otherwise contrary to public policy.' *Markborough California, Inc. v. Superior Court,* 227 Cal.App.3d 705, 714–715 [277 Cal.Rptr. 919] (Cal.Ct.App.1991). This is an affirmative defense that was not pled or preserved as an issue for trial in the Pretrial Order.

(Doc. 353, 44:1–45:15). The Court then ruled that Flagship was not entitled to a jury trial on the issue of unconscionability, concluding that the case authority cited by Flagship did not establish a right to jury trial and:

> Most importantly, the issue was not reserved for trial and an afterthought defense to enforcement of the contract cannot be countenanced. *See Canal Electric Co. v. Westinghouse Electric Co.,* 973 F.2d 988, 997–98 (1st Cir.1992) (raising unconscionability for the first time on appeal is untimely); *Oakwood Mobile Homes, Inc. v. Stevens,* 204 F.Supp.2d 947, 951 (D.W.Va.2002) (raising unconscionability for the first time on the day of mandatory arbitration hearing is too late; defense waived). *Cf. Beaver v. Figgie Intern. Corp.,* 849 F.2d 1472 (6th Cir.1988) (unpublished opinion) (on remand after grant of summary judgment reversed, issue of unconscionability now waived though it had never been previously raised).

(Doc. 353, 45:17–48:1). With regard to Flagship's claim of unconscionability as a matter of law, the Court ruled:

> *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.,* 89 Cal. App.4th 1042, 1052–1053 [107 Cal. Rptr.2d 645] (Cal.Ct.App.2001) (citing *A & M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473, 486–87 [186 Cal.Rptr. 114] (Cal.Ct.App.1982)) discusses unconsionability:
>> Unconscionability has both a procedural and a substantive element. The procedural element focuses [on] 'oppression' and 'surprise.' ' "Oppression" arises from an inequality of bargaining power which results in no real negotiation and "an absence of meaningful choice." "Surprise" involves the extent to which the supposedly agreed-upon terms are hidden in a

prolix printed form drafted by the party seeking to enforce the disputed terms.' The substantive element has to do with the effects of the contractual terms and whether they are unreasonable. Because a contract is largely an allocation of risks, a contractual provision is 'substantively suspect if it reallocates the risks in an objectively unreasonable or unexpected manner.' To be unenforceable, a contract must be both procedurally and substantively unconscionable, although the greater the procedural unconscionability, the less unreasonable the risk allocation that will be tolerated.

Plaintiffs assert that Marvin Reiche (who negotiated the lease on behalf of Plaintiffs) had little bargaining power ... As evidence Plaintiffs point out that the Lease is based on a pre-existing Excel lease negotiated with another restaurant ... Even assuming this fact to be true, Plaintiffs have not demonstrated 'oppression,' which requires circumstances where the oppressed party was not in a position to negotiate and given no meaningful choice. Defendants assert that Plaintiffs had a choice since they were considering multiple sites for their proposed restaurant ... Plaintiffs were experienced and sophisticated restaurant operators. The Lease was negotiated and Plaintiffs insisted on the exclusive use clause. There is no evidence that the Briggsmore Plaza was the only site under consideration or that the Lease was offered on a take it or leave it basis. Defendants also point out that the Lease was actively negotiated over a period of months and Plaintiffs 'submitted extensive comments on the draft.' ....

Plaintiffs rely on *A & M Produce Co. v. FMC Corp.* to show that even contracts negotiated by experienced parties can be unconscionable where there is great imbalance of bargaining power ... The factual scenario of *A & M Produce* is significantly different from the one at hand since the plaintiff was not permitted to negotiate the terms of the contract. *A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 491 [186 Cal. Rptr. 114] (Cal.Ct.App.1982). Plaintiffs did not adduce evidence that they were unable to negotiate the terms of the Lease. Plaintiffs did not show any other sites were unavailable or that they were without choice.

(Doc. 353, 48:3–49:21). As to the element of surprise as to Section 4.5, the Court ruled:

> With respect to § 4.5, the Lease shows that the parties modified the provision, striking out the term 'or the Access Area' several times. These changes were ratified by initials 'MGR' (Marvin G. Reiche) in the margins ... Plaintiffs cannot claim that § 4.5 escaped their notice.

(Doc. 353, 51:10–15).

Flagship contends that the Court's discussion of unconscionability in the November 19, 2004 Memorandum Decision was made only after finding that Flagship had not reserved the issue for trial with respect to the factual issues surrounding unconscionability of Section 4.5 and, therefore, the Court's "prior observations were dicta." Flagship refers to the Ninth Circuit's remand that the Court consider whether the Lease "in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances." Flagship asserts that the Ninth Circuit's mandate re-opens the issue of unconscionability in interpreting Section 4.5, citing *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir.2000) ("According to the rule of mandate, although lower courts are obliged to execute the terms of a mandate, they are free as to 'anything not foreclosed

by the mandate.' "). Flagship further contends that the Ninth Circuit's mandate "suggests that this Court construed the pretrial order too narrowly in finding that Plaintiffs did not 'preserve' the issue of unconscionability for trial." Flagship asserts:

Specifically, the pretrial order asserted that Plaintiffs were seeking rescission and also that Plaintiffs sought declaratory relief with respect to the parties' rights and obligations under the Lease. (Doc. No. 214, Pretrial Order at 14:10–15:21.) This statement of the relief sought, including a declaration of the rights of the parties, would seem sufficient to preserve the issue of unconscionability, with respect to Defendants' post-trial proffer of an interpretation of Section 4.5. If, as the court of appeal found, the statement of issues, facts and contentions in the pretrial order were sufficient to preserve Defendants' right to argue an interpretation of the Lease that they never presented before the jury's verdict was announced, it is also sufficient to preserve Plaintiffs' right to rebut such an argument, including the argument that Section 4.5 is unconscionable if interpreted as a waiver of rescission.

Although the Ninth Circuit's ruling in this case addressed the Court's invocation of judicial estoppel to bar Excel from contending that Section 4.5, Flagship's point that the Ninth Circuit's mandate allows consideration of the issue of unconscionability is well-taken because the Court is mandated to determine "whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances."

California Civil Code § 1670.5(a) provides:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Flagship argues that interpreting Section 4.5 as a waiver of rescission would render Section 4.5 unconscionable both substantively and procedurally, with the element of substantive unconscionability predominating over the element of procedural unconscionability.

As explained in *Gentry v. Superior Court*, 42 Cal.4th 443, 64 Cal.Rptr.3d 773, 165 P.3d 556 (2007), addressing the Court of Appeal's conclusion that a 30–day opt-out provision in an arbitration agreement was procedurally unconscionable:

" ' " To briefly recapitulate the principles of unconscionability, the doctrine has ' "both a 'procedural' and a 'substantive' element," the former focusing on " 'oppression' " or " 'surprise' " due to unequal bargaining power, the latter on " 'overly harsh' " or " 'one-sided' " results.' ... The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, " 'which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " ... Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided." '

As we have further explained: ' "The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability." ... But they need

not be present in the same degree. "Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves." ... In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.' ....

As the above suggests, a finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided ... [T]here are degrees of procedural unconscionability. Although certain terms in these contracts may be construed strictly, courts will not find these contracts substantively unconscionable, no matter how one-sided the terms appear to be. (See, e.g., *Nunes Turfgrass, Inc. v. Vaughan–Jacklin Seed Co.* (1988) 200 Cal.App.3d 1518, 1538–1539, 246 Cal.Rptr. 823 [liability limitation negotiated by two commercial entities upheld].) Contracts of adhesion that involve surprise or other sharp practices lie on the other side of the spectrum. (See, e.g., *Ellis v. McKinnon Broadcasting Co.* (1993) 18 Cal.App.4th 1796, 1804, 23 Cal.Rptr.2d 80 [party told that signing contract was 'mere formality' to conceal oppressive forfeiture provision].) Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced ... contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching.' ....

Thus, a conclusion that a contract contains no element of procedural unconscionability is tantamount to saying that, no matter how one-sided the contract terms, a court will not disturb the contract because of its confidence that the contract was negotiated freely, that the party subject to a seemingly one-sided term is presumed to have obtained some advantage from conceding the term or that, if one party negotiated poorly, it is not the court's place to rectify these kinds of errors or asymmetries."

42 Cal.4th at 468–470, 64 Cal.Rptr.3d 773, 165 P.3d 556.

Flagship again relies primarily on *A & M Produce Co. v. FMC Corp.,* 135 Cal. App.3d 473, 186 Cal.Rptr. 114 (1982). A & M brought suit against FMC from which it had bought a weight sizing machine for use in processing plaintiff's tomato crop, alleging breach of express and implied warranties. The trial court ruled that clauses in FMC's preprinted contract disclaiming all warranties and excluding consequential damages were unconscionable. The Court of Appeal affirmed. Flagship relies on the following statement from *A & M Produce Co.:*

Another factor supporting the trial court's determination involves the avoidability of damages and relates directly to the allocation of risks which lie at the foundation of the contractual bargain. It has been suggested that '[r]isk shifting is socially expensive and should not be undertaken in the absence of a good reason. An even better reason is required when to so shift is contrary to a contract freely negotiated.' ... But as we noted previously, FMC was the only party reasonably able to prevent this loss by not selling A & M a machine inadequate to meet its expressed needs ... 'If there is a type of risk allocation that should be subjected to special scrutiny, it is probably the shifting to one

party of a risk that *only* the other party can avoid.' . . . .

135 Cal.App.3d at 493, 186 Cal.Rptr. 114.

Flagship argues that, according to Excel, Section 4.5 is not a reciprocal provision; it applies only to the tenant's obligations and does not bar any remedy by the landlord. Flagship refers to Section 18.2(c) of the Lease:

18. *EVENTS OF DEFAULT: REMEDIES*

. . .

18.2 *Remedies.*

. . .

(c) If an Event of Default shall occur, then, in addition to any other rights or remedies available to Landlord at law or in equity, Landlord shall have the right to perform some or all of Tenant's Obligations which are then in default, without further notice to Tenant. In such event, any and all costs incurred by Landlord therefor (including, without limitation, reasonable attorney's fees and expenses) shall be payable by Tenant to Landlord upon demand.

Flagship argues that Excel's interpretation of the Lease is that Flagship waived its right to rescind in the event of Excel's material breach, but Excel maintained the right to all equitable remedies, including rescission, in the event of Flagship's breach. Citing *Money Store Investment Corp. v. Southern California Bank*, 98 Cal. App.4th 722, 728, 120 Cal.Rptr.2d 58 (2002), Flagship argues that "such an imbalance in the parties' rights to rescind the agreement renders the Lease subject to attack for the lack of mutuality of obligation."

Flagship's reliance on the *Money Store Investment Corp.* to establish that Section 4.5 as construed by Excel is unconscionable, is misplaced. In *Money Store Investment Corp.*, the Court of Appeal stated:

The Bank asserts that the agreement was illusory because the Money Store's instructions 'reserved the right to withdraw or amend these instructions at any time prior to the close of escrow.' The Bank is correct on its general point of law: 'Where a contract imposes no definite obligation on one party to perform, it lacks mutuality of obligation. It is elementary that where performance is optional with one of the parties no enforceable obligation exists . . . .'

. . .

A corollary to that rule exists, however. An agreement that is otherwise illusory may be enforced where the promisor has rendered at least partial performance . . . The Money Store performed. It provided the loan money necessary to complete the sale. Performance cured any illusory aspect of the agreement.

Here, Flagship does not argue that the Lease was illusory; rather, Flagship argues that Section 4.5, as construed by Excel, should not be enforced because of unconsionability.

Flagship asserts that Excel's interpretation of Section 4.5 allocates the risk of Excel's failure to honor their promise of an exclusive buffet restaurant in the shopping center to Flagship. Flagship argues:

[Excel's] interpretation of Section 4.5 . . . means that Flagship agreed to remain in a contract with Defendants regardless of Defendants' material breach; and that Flagship and the Reiches agreed to spend $2 million constructing a building on Defendants' property, with no ability to recoup the loss from Defendants in the event of Defendants' material breach of the Lease. In this regard, Defendants offered no evidence at trial that the parties intended Section 4.5 to operate in that fashion, or that the Reiches understood that Section 4.5 meant that the Defendants could breach the exclusive [sic] immediately, and Flagship would be stuck with the Lease.

This result, like the preclusion of consequential damages in *A & M Produce* is substantively unconscionable and shocking to the conscience.

Flagship fails to demonstrate procedural unconscionability. As concluded in the November 19, 2004 Memorandum Decision, the Lease was negotiated on both sides by sophisticated, experienced parties. That Flagship did not know or understand that Excel would attempt to construe Section 4.5 to preclude rescission of the lease by Flagship because of Excel's breach of Section 6.3's exclusive use provision does not establish procedural unconscionability.

### 8. *Jury's Finding of Material Breach Defeats Independent Covenant.*

Flagship argues that the jury's finding of material breach defeats any contention that the exclusive use provision was an independent covenant, referring to the statement in Section 4.5 that "[t]he obligations of Tenant in this Lease shall be separate and independent covenants and agreements." Flagship contends that, if Excel believed that Section 4.5 made Excel's obligation to honor the exclusive use provision an independent covenant, thereby making the breach of the exclusive use provision not material, Excel should have presented this contention to the jury. Flagship asserts: "Because Defendants did not do so, and the jury decided the question of materiality, they cannot now ask the court to decide this question."

Flagship cites *Gaia Technologies, Inc. v. Recycled Products, Corp.,* 175 F.3d 365 (5th Cir.1999). In *Gaia,* the alleged owner of patents and trademarks brought an action against corporate and individual defendants for infringement under federal law, and for unfair competition, tortious interference with prospective contractual relations, and misappropriation of trade secrets under state law. After the alleged owner obtained judgment against defendants, the Federal Circuit reversed as to the infringement claims and remanded, allowing the District Court to decide whether to exercise supplemental jurisdiction over the state law claims. On remand, the District Court entered judgment for the alleged owner on the state law claims and the individual defendants appealed to the Fifth Circuit. The Fifth Circuit held that the District Court erred in relying on Rule 49(a), Federal Rules of Civil Procedure, to make findings contrary to the jury's verdict:

> Nothing in the text of Rule 49(a) authorizes a district court to reform a jury's decision on issues submitted to the jury. Rule 49(a) allows the district court to make its own findings only as to issues not submitted to the jury ... Furthermore, Rule 49(a) does not permit a district court to make findings contrary to the jury verdict. *See Askanase* [*v. Fatjo* ], 130 F.3d [657] at 670 [ (5th Cir. 1997) ] ('Appellant correctly states that a Rule 49(a) finding cannot be inconsistent with the jury verdict.'); *see also Floyd v. Laws,* 929 F.2d 1390, 1397 (9th Cir.1991) (holding that 'under Rule 49(a), the trial court simply cannot choose to ignore a legitimate finding that is part of the special verdict'). Here, the district court submitted the elements of Gaia's state law claims to the jury, and the jury found that Gaia failed to prove any of the elements as to the individual defendants. Thus Rule 49(a) does not authorize the district court to reform the jury's state law findings in order to hold the individual defendant's liable for Gaia's state law causes of action.

*Id.* at 370–371.

Flagship notes that, although Flagship argued that the verdict was a special verdict, the Court ruled that the verdict was a general verdict. (Doc. 353, November 19, 2004 Memorandum Decision, 29:6–7). Flagship contends that the "rule articulat-

ed in *Gaia*" is not tied to any particular form of verdict:

> Preliminarily, the individual defendants contend that we should treat the jury verdict as a general verdict accompanied by interrogatories, governed by Rule 49(b), as opposed to a special verdict, governed by Rule 49(a) ... According to the defendants, Rule 49(b) affords greater deference to a jury's finding than Rule 49(a). We need not address this contention, however, because we conclude that not even Rule 49(a) authorizes the district court's modification of the jury verdict. Gaia does not contend that Rule 49(b) provides an alternative ground for upholding the district court's reformation.

*Gaia, supra,* 175 F.3d at 370 n. 5. Because, Flagship argues, the type of verdict does not affect the "validity of this rule," and "because the jury decided that the exclusive use provision, and Defendants' breach thereof was material, Defendants cannot now ask the court to make a ruling contrary to the jury's verdict."

Excel responds that the jury's verdict is irrelevant to interpretation of the Ground Lease, an issue of law for the Court. However, as ruled *supra,* Excel's construction of Section 4.5 is without merit.

Excel further asserts that, in an action at law for breach of contract, a material breach generally entitles the non-breaching party to cancel a contract prospectively and recover damages, but does not, as a matter of course justify rescission. Excel contends that Flagship cites no authority allowing rescission for breach of an independent covenant:

> They simply assert that the jury's finding of a 'material breach' in the breach of contract action trumps the Ground Lease and converts its independent covenants into conditions precedent. This is unsustainable as a matter of the law of independent covenants and, therefore,

the finding of material breach is irrelevant to the issues now before the Court.

Excel argues that, if the jury had found the exclusive use provision to be a dependent covenant, such a verdict would have been vacated by the Court under Rule 50, Federal Rules of Civil Procedure, as not supported by the evidence. For the reasons stated *supra,* Excel's contention is baseless, if not vexatious. A jury does not make a legal finding whether a covenant is dependent.

Excel cites *Barrera v. State Farm Mut. Auto. Ins. Co.,* 71 Cal.2d 659, 79 Cal.Rptr. 106, 456 P.2d 674 (1969). In *Barrera,* the plaintiff sued State Farm to compel payment of a judgment against State Farm's insureds, the Alves, for their negligent driving that injured the plaintiff. Plaintiff alleged the enforceability at the time of the accident of State Farm's liability policy. State Farm denied the validity of the policy, and cross-claimed seeking a declaration that the policy was void *ab initio* because it was issued in reliance on a material misrepresentation by the Alves. Plaintiff contended that State Farm was estopped to rescind the policy six months after the accident because State Farm led the Alves to believe that he was insured and because State Farm negligently failed to discover within a reasonable time the misrepresentation in the application tendered more than a year prior to the accident. The trial court found that State Farm issued the policy in reliance on a material misrepresentation, that rescission was therefore justified, and that State Farm acted promptly upon discovery of the misrepresentation, and found for State Farm. Plaintiff moved for a new trial on the ground that the public policy expressed in California's Financial Responsibility Law impelled a finding of laches by State Farm in its belated discovery of the misrepresentation and that its failure to act promptly worked to the detriment of an innocent

member of the public, who should therefore recover against State Farm. The trial court denied the motion for new trial. On appeal, the Supreme Court reversed for a new trial, ruling that an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and issuance of the policy; that this duty inures directly to the benefit of third persons injured by the insured; that the injured party, who has obtained an unsatisfied judgment against the insured, may proceed against the insurer; and that the insurer cannot then successfully defend upon the ground of its own failure reasonably to investigate the application. 71 Cal.2d at 663, 79 Cal.Rptr. 106, 456 P.2d 674. The Supreme Court noted:

> In addition to arguing that State Farm was estopped to rescind the policy because of negligent failure to discover the misrepresentation within a reasonable time, plaintiff also argued that section 651 of the Insurance Code applied to rescission as well as to prospective cancellation of automobile insurance policies, and that therefore the attempted rescission did not take effect until 10 days after notice of rescission was sent to Mr. Alves. If termination of the policy did not occur until after notice, the policy remained in effect at the time of the accident.
>
> Plaintiff's contention regarding section 651 runs counter to the statutory scheme for termination of insurance contracts and blurs the clear statutory distinction between 'rescission' (retroactive termination) and 'cancellation' (prospective termination) of insurance policies. Section 651 provides: 'Notwithstanding any other provision of this code, no cancellation by an insurer of an auto liability insurance policy shall be effective prior to the mailing or delivery to the named insured at the address shown in the policy, of a written notice of cancellation stating when, not less than ten (10) days after the date of such mailing or delivery, the date the cancellation shall become effective.'
>
> The Legislature added section 651 in 1957 ... In 1957, the Insurance Code did not contain a separate chapter on 'Cancellation' ....
>
> The statutory scheme reflects a deliberate distinction between 'rescission' and 'cancellation.' Sections 331, 338, and 359, which prescribe the grounds for rescission, all involve false statements or material omissions in the procurement of the policy. Section 660 ..., on the other hand, provided: 'The commissioner, by regulation, shall prescribe the grounds upon which an insurer may cancel a policy of automobile insurance. No insurer shall cancel a policy of automobile insurance except upon such ground or grounds as have been prescribed by the commissioner.' ....
>
> Unless we say that automobile liability insurance policies cannot be rescinded at all and that section 660 completely abrogated the rescission section for automobile liability insurance, we must hold that section 651, which specifically refers to 'cancellation,' does not control the procedure for 'rescission' of automobile liability insurance. Instead, the general section governing rescission of insurance policies, section 650, applies. Section 650 provides: 'Whenever a right to rescind a contract of insurance is given to the insurer by any provision of this part such right may be exercised at any time previous to the commencement of an action on the contract.' The issue, then, turns on the validity of plaintiff's contention that the public policy of this state requires that an automobile liability insurer reasonably investigate within a reasonable time after issuance of the policy or otherwise be estopped to re-

scind the policy, at least in an action by an injured person who has obtained a judgment from the insured.

71 Cal.2d at 663 n. 3, 79 Cal.Rptr. 106, 456 P.2d 674.

Excel also cites *Mamula v. McCulloch,* 275 Cal.App.2d 184, 196–197, 79 Cal.Rptr. 571 (1969):

> Plaintiff urges that the court erred in failing to make findings upon the issue as to whether or not she was entitled to recover on the theory of unjust enrichment.
>
> The trial court found that the oral agreement of July 1, 1963, was for the abandonment and cancellation of the oral purchase and sale agreement involving the hospital property and that it was supported by a valuable consideration. As heretofore pointed out, such oral agreement made a complete disposition of the rights of the respective parties under the oral purchase and sale agreement. Such rights having been completely settled by the oral contract of abandonment, there was no basis for the application of the rule of unjust enrichment.
>
> 'To "cancel" a contract means to abrogate so much of it as remains unperformed. It differs from "rescission," which means to restore the parties to their former position. The one refers to the state of things at the time of cancellation; the other to the state of things existing when the contract was made.' ... Here, the oral agreement of cancellation did away with the oral agreement of purchase and sale upon the terms and conditions and with the consequences mentioned in the agreement of cancellation ... In this state of the record, a specific finding on whether plaintiff was or was not entitled to recover on the theory of unjust enrichment would be redundant.

Excel cites *Fireman's Fund American Ins. Co. v. Escobedo,* 80 Cal.App.3d 610, 145 Cal.Rptr. 785 (1978), which involved an action by the insurance company of one motorist against the insurance company of the second motorist and the motorists. The trial court determined that defendant insurer's rescission of its insureds' assigned risk automobile policy was effective as against its insureds, but ineffective as against the owners and drivers of the other vehicle and plaintiff, their insurer. On appeal, the Court of Appeals addressed the argument that once a risk has been assigned under the California Automobile Assigned Risk Plan (CAARP) and the designated insurer has ratified the coverage, 10 California Administrative Code § 2470, specifies the only method open to an insurer to relieve itself of an assigned risk which was accepted:

> Section 331 of the Insurance Code provides: 'Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance.' Concealment is defined as 'Neglect to communicate that which a party knows, and ought to communicate ....' ... In addition to concealment as a ground for rescission, section 359 of the Insurance Code provides that a contract of insurance may be rescinded on the ground of material misrepresentation: 'If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false.' ....
>
> The California Assigned Risk Plan was enacted to provide liability insurance coverage for applicants who are *in good faith* entitled to but unable to procure such insurance through ordinary methods ... Nothing in the authorizing legislation suggests that the laws applying to insurance policies in general are not applicable to the assigned risk plan. The

regulations promulgated by CAARP deal only with cancellation and not rescission. Cancellation and rescission are not synonymous. One is prospective, while the other is retroactive ... Appellant Employer's Casualty is correct in its contention that the statutory remedy of rescission is applicable to assigned risk policies.

80 Cal.App.3d at 619, 145 Cal.Rptr. 785.

Excel also cites *Welles v. Turner Entertainment Co., supra*, 503 F.3d 728.[4] In *Welles*, the plaintiff argued that the Exit Agreement, which "cancelled and terminated" the Production Agreement, returned the *Citizen Kane* copyright to Mercury. The Ninth Circuit ruled:

> [T]he Exit Agreement stated that it was 'the mutual desire of the parties to terminate and cancel' their prior agreements. Beatrice Welles argues that this language rescinded the parties' prior agreements and thus returned any right Orson Welles and Mercury had in the *Citizen Kane* motion picture to them. However, under California law, it seems that 'terminate' and 'cancel' mean something different from 'rescind':
>
> > The words 'terminate,' 'revoke' and 'cancel,' ... all have the same meaning, namely, the abrogation of so much of the contract as might remain executory at the time notice is given, and must be sharply distinguished from the word 'rescind,' ... which conveys a retroactive effect, meaning to restore the parties to their former position.
>
> *Grant v. Aerodraulics Co.*, 91 Cal. App.2d 68, 204 P.2d 683 (1949). Thus, under California law, the Exit Agreement prospectively terminated and cancelled Orson Welles's right to royalties, but did not retroactively rescind RKO's copyright in the *Citizen Kane* motion picture unless RKO's copyright remained executory at the time of the Exit Agreement.

503 F.3d at 738.

Excel asserts that the jury was not instructed on rescission or failure of consideration, but was instructed only on prospective cancellation in connection with Flagship's breach of contract claim. This, of course, was a result of the parties' express agreement that the issue of rescission was to be determined after the jury's verdict. Excel refers to the Court's statement to the jury on December 2, 2003 (Exh. E to Excel's response to Flagship's motion regarding interpretation of Section 4.5):

> defendant was—and I'm using the word Excel Realty Partners, that's one of the defendants—was canceled.
>
> A party to a contract may cancel the contract if, for any reason, the party does not receive the material performance that was promised by the other party or if an important part of the performance that was promised was not provided.
>
> The term 'material,' as used in the instructions, means important or serious. You must decide whether plaintiff failed to receive any material performance defendant promised to provide. Performance is material if it is important to a contract and if it is likely to cause a reasonable person not to have entered into the contract if such performance was not provided.

Thus, Excel contends, the jury was never instructed on rescission and never asked to determine whether there was a failure of consideration (or whether the breach was so material that it would constitute a fail-

---

**4.** Excel cited *Welles* as *Welles v. Turner Entertainment Co.*, 488 F.3d 1178 (9th Cir.2007). However, the opinion was amended and superseded on denial of rehearing.

ure of consideration). Based on *Welles,* Excel contends:

> [T]he jury verdict of material breach in no way constituted a finding of a failure of consideration or of a right to rescission. And, the jury's verdict cannot overrule a fundamental principle of contract, that breach of an independent covenant does not justify rescission.

Flagship replies that the cases upon which Excel relies in distinguishing between "cancel" and "rescind" concern interpretation of insurance policy language under very specific provisions of the California Insurance Code or the construction of a second agreement that purported to "cancel" a prior agreement. This is true. The insurance contract cases are inapplicable. Flagship cites *Pico Citizens Bank v. Tafco, Inc.,* 201 Cal.App.2d 131, 19 Cal. Rptr. 905 (1962).

In *Pico Citizens Bank,* Moos and Tafco entered into a written contract by which Moos agreed to manufacture and Tafco agreed to sell knife and scissor sharpeners. In a letter signed by Tafco's president, various oral agreements theretofore reached were confirmed; among other things, the agreement provided that title to the sharpeners would remain in Moos until they were sold by Tafco to third parties. Another clause of the contract provided: "In the event it [the contract] is cancelled by either party, the above arrangement will remain in effect until you [seller] have been paid for the merchandise delivered and the dies and other equipment of ours returned to us. Neither party shall terminate any part of this agreement without giving the party ninety (90) days written notice in advance." The appellate court held:

> Taking up the first of Tafco's major points on appeal, it is contended that neither the letter of May 10, 1955, nor the notice of rescission received by Tafco on June 24, 1955, served to cancel the

contract within the meaning of the subject agreement. Emphasized by Tafco is the claim that the word 'cancel' is not found in either document. Thus, the May 10 letter simply demanded an accounting and payment in full of the outstanding balance, while the June notice and demand made use of the word 'rescission' in its heading. There is a distinction, of course, between the terms 'cancel' and 'rescind'—accordingly, it has been observed that 'an important problem of construction is presented by notices or agreements which purport to terminate the contract.' (Witkin, Summary of Cal. Law (7th ed. 1960) 324). Cited in the work just quoted is *Winter v. Kitto,* 100 Cal.App. 302, 279 P. 1024, wherein expressions of 'cancellation' or 'rescission' were not construed as the renunciation of any claim for damages for prior breach unless such intention clearly appears. The factual question is a close one; but two trials have resulted in findings that either or both of the documents just mentioned effected a cancellation pursuant to the terms of the agreement. 'The question of whether a contract has been cancelled, rescinded or abandoned is a mixed question of law and fact ... which is addressed to the trial court ... and the finding of the trial court will be upheld if it is supported by substantial evidence.' ....

Relying on this statement from *Pico Citizens Bank* and their asserted distinction of the cases relied upon by Excel, Flagship asserts:

> As such, the difference between cancellation and rescission is material to construing a second agreement or writing and whether it purports to cancel the remainder of a contract that is executory, or whether it seeks to rescind the contract ... Here, Excel does not raise any issue that Flagship's notice of rescission, which was presented to the

jury, sought anything other than rescission. Overall, Defendants do not explain how these cases advance their proffered interpretation of the Lease.

What can be said about the jury's verdict is that it determined there was a breach of contract and that the breach was material, giving rise to Flagship's election of remedies.

### 9. *Equitable Estoppel.*

■ Although conceding that judicial estoppel may not apply to the facts, Flagship asserts that the Court did not decide whether equitable estoppel applied. Flagship refers to the September 30 Memorandum Decision, (Doc. 362, 18:23–19:):

> Defendant also argues that the court erred in holding that equitable estoppel barred Defendant from asserting § 4.5 as a defense. While it is true that the court cited elements of equitable estoppel in the estoppel section of its decision, it is not the case that the court actually held that equitable estoppel applied. A careful reading of the estoppel discussion reveals that the court's reasoning followed the law of judicial estoppel. At the end of the section, the court stated that '[b]y staying silent on § 4.5 until the 9th day of trial and leading the court and Plaintiffs to believe that rescission was being actively litigated, Defendants are estopped from raising § 4.5 as a bar to a rescission remedy.' (Doc. 353, November 2004 Order 53) The court's discussion of the equitable estoppel standard and the absence of specific reference to judicial estoppel, even if ambiguous, does not prevent the application of judicial estoppel. This holding requiring Defendant to be bound by its conduct throughout the litigation is not clearly erroneous. Defendant was properly estopped from asserting § 4.5 as a bar to rescission.

■ Four elements must ordinarily be proved to establish an equitable estoppel:

(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. *Salgado–Diaz v. Gonzales,* 395 F.3d 1158, 1166 (9th Cir.2005); *Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.1960).

Flagship argues that these elements are satisfied:

> Defendants allowed this case to proceed from the complaint through discovery, through trial without ever suggesting that Plaintiffs' were barred from their clearly pled claim for rescission. Defendants acted such that Plaintiffs had the right to believe the Lease did not prevent rescission, and that Defendants would assert this position. Plaintiffs had no idea Defendants would claim a provision listed in the Lease paragraph concerning rent and not expressly mentioning the word rescission barred the remedy of rescission. Plaintiffs reliance on Defendants' position is only strengthened by Defendants complete failure to raise the issue in their answers, discovery responses, summary judgment proceedings, in motions *in limine,* pretrial statements, or pretrial conferences. As this Court has recognized, Plaintiffs relied on Defendants' failure to assert Section 4.5 as a bar to rescission, and therefore were prejudiced by not having the opportunity to conduct discovery as to the 'commercial setting, purpose, and effect' of Section 4.5. (Doc. No. 362 at 18:10–22).

In the September 30 Memorandum Decision, the Court, in its discussion of application of judicial estoppel, ruled:

Third, Defendant would obtain an unfair advantage if it is allowed to assert § 4.5 as a bar to rescission at such a late stage in the litigation. Discovery was not conducted as to § 4.5. Plaintiffs did not know the section would be invoked as a defense by any dispositive motion or the Pretrial Order. The contract damages awarded by the jury that Defendant would have to pay amount to approximately $1.5 million; the damages that Defendant could potentially pay if rescission is granted are substantially more, up to the [sic] approximately $3.9 million. Finally, estoppel in this situation serves the overall policy goal of judicial estoppel to 'protect against a litigant playing fast and loose with the courts.' . . . .

(Doc. No. 362 at 18:10–22).

Excel responds that Flagship's argument concerning application of equitable estoppel is "utterly spurious." Excel refers to the November 19, 2004 Memorandum Decision, (Doc. 353), where the Court discussed whether Excel waived application of Section 4.5 as a contractual limitation on the recovery available to Flagship. (Doc. 353, 37:12–54:5). Specifically, Excel refers to the following conclusion in the November 19, 2004 Memorandum Decision:

With respect to contractual limitations on damages in a contract dispute, the defense is contained in the cause of action itself. Both sides had full access to the Lease (38 pages long) and are presumed to have examined it carefully. There is no danger of unfair surprise by assertion of this defense.

(Doc. 353, 41:22–26). Excel contends that Flagship was not ignorant of the true facts:

Excel is unaware of any basis or any judicial precedent applying equitable estoppel to a party's assertion of its rights under a written contract, the provisions of which were specifically negotiated and executed by the parties and Plaintiffs have cited no such authority. This is not a case of a hidden unknown fact being secreted by one party to disadvantage another.

Flagship replies that Excel mischaracterizes Flagship's asserted basis for equitable estoppel:

Defendants never asserted their interpretation that Section 4.5 bars rescission until over two years after Plaintiff's notice of rescission, and until after a 9–day trial litigating the very remedy they claim Section 4.5 bars. (See Pltfs' P & A at 19–23.) If Defendants believed Section 4.5 meant what they now claim it does, it was incumbent on them to assert the bar to rescission upon receipt of Plaintiffs' notice of rescission, in their answer, discovery responses, summary judgment motions, trial brief, or motions in limine. Instead, Defendants allowed the entire case to proceed, even acquiescing that rescission was an available remedy at the pretrial conference (See Pltfs' ER, Ex. J at 18), without mentioning that any provision of the Lease, in their view, barred rescission. A clearer case for equitable estoppel could not be made.

Flagship's reference is to the hearing on motions in limine conducted on October 31, 2003, where the Court inquired "whether anybody wants the jury to be making any findings on the rescission." Mr. Fairbrook indicated that Flagship wished issues of contested fact as to equitable matters submitted to the jury. Mr. Carroll stated:

The defense perspective is that there's two issues really. One is we believe the plaintiffs have taken the position that mistake is no longer an issue in this case, both in conjunction with the pretrial statement and in the opposition of motions for summary judgment.

The only grounds for rescission left in the case at this point is a failure for consideration. That's the position we take, that's what's been represented, that's the position we understood to be the case at this juncture.

(Doc. 502, Exh. J).

There is no question that Excel failed to assert that Section 4.5 precluded the remedy of rescission until after the trial in this action and that Excel's delay in asserting its interpretation of Section 4.5 caused undue attorney and judicial time in post-trial proceedings involving Flagship's election of the rescission remedy. Excel's contention that Flagship was always aware that Section 4.5 barred rescission by Flagship of the lease because of Excel's breach of the exclusive use provision is not supported by the record in this action and Excel's belated assertion of its position precluded Flagship from conducting discovery concerning Excel's interpretation of Section 4.5 or seeking summary judgment as to the construction of Section 4.5 in the context of extrinsic evidence. The position was also unknown to the Court. The Section 4.5 bar theory was not asserted in pleadings, it was not specifically disclosed in the Pretrial Order, nor was it the subject of any discussion in a trial brief or in jury instruction input.

### 10. Arguments Raised by Excel in Opposition to Flagship's Motion.

In opposing Flagship's motion, Excel asserts that rescission is barred because Plaintiffs, by their conduct, affirmed the Ground Lease after they asserted that Excel breached it, and because Plaintiffs failed to proffer the written consent of the Money Store to extinguish the estate created by the Ground Lease as required by Section 22.4. It is in connection with this latter contention that Excel's motion to strike and/or for leave to file a sur-reply brief is directed. In addition, Flagship contends that Excel attacks the jury instructions with respect to rescission.

### a. Outside the Ninth Circuit's Mandate.

Flagship argues that these contentions are outside the mandate of the Ninth Circuit, e.g., to "determine in the first instance whether the contract, in its entirety, allows for rescission and whether California law would give effect to the lease's limitations on remedies in these circumstances."

As explained in *Kearns v. Field*, 453 F.2d 349, 350 (9th Cir.1972):

The mandate is controlling as to all matters within its compass ...; however, any issue not expressly or impliedly disposed of on appeal may be considered by the trial court on remand.

Flagship's contention raises the question whether the Ninth Circuit's remand is a "limited remand" or a "general remand." The term "limited remand" describes a remand to the district court for proceedings prior to the Ninth Circuit's consideration of the merits of an appeal. *See United States v. Washington*, 172 F.3d 1116, 1118 (9th Cir.1999), citing *Mirchandani v. United States*, 836 F.2d 1223, 1225 (9th Cir.1988). Once an appeal has been decided on the merits, the mandate is issued; if the case is remanded for further proceedings, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal. *Id.*, citing *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir.1984). The mandate " 'is controlling as to all matters within its compass, but leaves the district court any issue not expressly or impliedly disposed of on appeal.' " *Id.*

In contending that the issues raised by Excel are outside the mandate, Flagship asserts that it is clear that the Ninth Circuit specifically directed the Court to decide whether Section 4.5 of the Lease, as

construed in its entirety, is a bar to rescission. Flagship argues:

> While the court expressly left open the question of rescission damages, the mandate did not set the case at large. Importantly, the court of appeal did not disturb the jury's verdict. Most significantly in this regard, Excel on appeal attacked the jury verdict in two respects: arguing that the jury was not instructed on rescission, and that the evidence was insufficient to support a finding of material breach, necessary to support rescission ... In issuing a limited mandate that the district court must decide whether Section 4.5 of the Lease bars the remedy of rescission, the court of appeal impliedly rejected these arguments. In this regard, it would make little sense to remand the case to the district court to determine if rescission could be elected by Plaintiffs if the jury's finding of a material breach was not supported by the evidence as Excel contended on appeal. Accordingly, implied within the court of appeal's mandate is a rejection of Defendants' claims of instructional error and sufficiency of the evidence.

Flagship's contention is without merit. The Ninth Circuit's remand is broad enough to permit the Court to consider whether rescission, if permissible under the terms of the lease, is nonetheless barred under California law because of Flagship's conduct after notice of rescission was given.

### b. *Rescission Barred by Flagship's Conduct.*

■■■ Excel argues that rescission is barred because Flagship affirmed the Lease after asserting that Excel had breached it.

Excel cites 1 Witkin, *Summary of California Law*, Contracts, § 886: "The injured party may lose his right to rescind by ... conduct (such as retention of bene-fits) indicating an election to affirm the contract." Excel further cites *Neet v. Holmes*, 25 Cal.2d 447, 457–458, 154 P.2d 854 (1944):

> The general rule, with certain exceptions not applicable to the facts involved in the case, is that the offer to restore what has been received under the contract is a condition precedent to maintaining an action founded on the assumption that rescission has been accomplished by the act of the party ... The right to rescind may be waived ... It is waived by recognition of the existence of the contract after the right to rescind was created ... Waiver of a right to rescind will be presumed against a party who, having full knowledge of the circumstances which would warrant him in rescinding, nevertheless accepts and retains benefits accruing to him under the contract ... It has been said that citation of authorities is unnecessary in support of the doctrine well established in this state that an affirmance of the contract at a time subsequent to the discovery of the falsity of the representations inducing its execution forecloses the exercise of the right of rescission.

Excel argues that Flagship affirmed the Lease by entering into two Forebearance Agreements with The Money Store in October 2001 and October 2002, respectively. (Excel's Response, Exhs. B and C). The Forebearance Agreements each provide that Flagship "shall continue to make monthly lease payments to Excel Realty Partners." The Forebearance Agreements provide:

> It is expressly understood that the failure to make payments or meet any term as referenced in this Agreement will constitute a default of the Forebearance Agreement and [TMS] will then be free to exercise any and all rights consistent

with the Stockton Loan and the Modesto Loan agreements.

Excel asserts that Flagship voluntarily entered into the Forebearance Agreements with full knowledge of their terms and agreed to dismiss The Money Store from this lawsuit in exchange for Flagship's covenant to keep the Lease in full force and effect. Excel refers to a partial transcript of the Rule 50 motions during the jury trial on November 26, 2003:

> And I don't know—my tentative ruling is I don't see this as a constructive eviction case.
>
> MR. FAIRBROOK: Okay.
>
> THE COURT: So I will read those cases and I will give it some thought, but that's the way I see it.
>
> MR. FAIRBROOK: Let me underscore one point for you. I think the critical factor is, and the evidence is this, that we closed the restaurant, the equipment was removed, and it remained vacant but for the attempts—
>
> THE COURT: I know that, but you are charged with knowledge of the law and the fact that—and there are good reasons, you know, not to have sued, but you could have sued the lender for putting you in this position and for not backing you a hundred percent, and you chose to compromise with that lender because they have got the gun at your head and they are saying, in other words, 'Mitigate, try to find a new tenant, keep paying the rent, don't just use the real property remedies here and the contract remedies, but primarily the real property, which says when you are constructively evicted, you have got to go, you have got to get out and give back the keys.'
>
> . . .
>
> MR. FAIRBROOK: When they talk about those, they talk about the benefit that the tenant receives by remaining in possession and hedging his bets on

whether he is going to overcome it and none of those, none of those things exist here. And that's why I think those cases—

> THE COURT: I know that. And—but what the law says, and you are not in the strong bargaining position where you are in default on a $2 million loan, quite frankly, and the lender is willing to do anything, except basically cut you off. So the bottom line is that, unfortunately, counsel for the lender wasn't willing to recognize that your optimum condition was to return the keys and get as far away from that site as you possibly could.

(Excel's Response, Exh. D).

Excel further refers to evidence that Flagship retained a real estate agent from April 2001 through the trial to market the Premises for sale or sublease and that, in 2001, Flagship had a specific buyer and conducted negotiations with The Money Store, Excel, and the potential buyer to sell the Lease and the Premises. (Excel's Response, Exh. B). Excel asserts in a footnote:

> After this proposed sale fell through, Plaintiffs destroyed the *status quo ante* by agreeing to a distress sale of the Golden Corral's restaurant equipment, in which equipment that Plaintiffs claim 'cost' $600,000 was disposed of for $11,000.00. Here again, Plaintiffs acted in a manner wholly inconsistent with rescission.

Excel contends that, in October 2003, on the eve of trial, Flagship sublet the Premises for a Halloween costume store. All of this conduct, Excel argues, demonstrates that Flagship waived the right to rescind the Lease by its conduct:

> Here, Plaintiffs not only continued to treat the Ground Lease as binding by paying rent and subletting the premises, but they also held out the Ground Lease

as binding to third parties, when they attempted to sell it and the restaurant business.

However, as Flagship notes, Excel expressly confirmed during the trial that Flagship's continued payment of rent was not a basis for waiver of the right to rescind:

MR. CARROLL: Your Honor, I don't believe there has been any claim made that—because of relevance, that the payment of any of the lease payments was in any way a defense in this case.

THE COURT: I understand there to be a claim for the lease payments because there is a claim for rescission as of the date of notice of termination of the lease and, therefore, this is relevant evidence because they are continuing to pay under protest because they were required by the lender.

MR. CARROLL: We are not contending in this case that continued payment in any way is a defense for or impairs their ability to rescind.

THE COURT: It's an element of damage that is sought to be recovered.

MR. CARROLL: But this letter isn't an element of damages. The check is, your Honor.

MR. WASHBURN: There are claims of waiver and estoppel.

THE COURT: So long as waiver and estoppel is claimed.

MR. CARROLL: Not on the defense of any payments. It has never been in this case.

THE COURT: What we will do is this. On that condition, that there be no argument to the jury and there be no suggestion that the continued payment of rent under protest would be a waiver of [sic] estoppel, which would be a waiver of any kind of defense. We will keep the letter out, but we have already got the witness' testimony about how long they continued to make these rent pay-

ments. [¶] You may ask your next question.

(Excel's Motion, Exh. K, 590:17–591:21).

Flagship argues that Excel is now judicially estopped from asserting that Flagship's continued payment of rent waives rescission of the Lease. Determining whether judicial estoppel should be invoked is informed by several factors: (1) whether a party adopts a position clearly inconsistent with its earlier position; (2) whether the court accepted the party's earlier position; and (3) whether the party would gain an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *New Hampshire v. Maine*, 532 U.S. 742, 750–751, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). In addition, Flagship argues that Excel's argument violates the Ninth Circuit's mandate:

The court of appeal's mandate and findings with respect to the defense of rescission and judicial estoppel are targeted at Defendants' attempt to defeat rescission on the basis of Section 4.5 of the Lease, not on the basis of Plaintiffs' *conduct.* To allow Defendants to raise the defense of waiver based on conduct at this stage would violate the court of appeal's mandate and would amount to reconsideration of the jury's verdict.

Flagship further argues that the continued payment of rent under protest on a premises Flagship had vacated and was deriving no benefit from, does not demonstrate affirmation of the Lease, citing *DRG/Beverly Hills v. Chopstix Dim Sum Cafe and Takeout III, Ltd.,* 30 Cal.App.4th 54, 59, 35 Cal.Rptr.2d 515: "Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only." Flagship contends:

Defendants offered nothing with respect to Plaintiffs' intent to negate the evidence of payment of rent under protest

and the intent to rescind. The evidence was that Plaintiffs surrendered possession, but that Plaintiffs' surrender was refused by Defendants. Moreover, the evidence offered at trial was that after the close of Plaintiffs' business in April 2001, Plaintiffs never operated a restaurant there or enjoyed use of the premises. Instead, due to Defendants' refusal to accept Plaintiffs' surrender as a means of mitigation, Plaintiffs entered into an agreement with the bank wherein Plaintiffs agreed to pay rent ... The evidence further offered by Plaintiffs demonstrated that with each rent payment made under protest, a protest letter was sent, thus indicating an affirmative intent *not to affirm the lease or accept its benefits,* a fact which Defendants conceded in order to keep the protest letters out of evidence ... In other words, the evidence in this case was that Plaintiffs' continued payment of rent under the forebearance agreements was done not in an attempt to do any fact inconsistent with the claim of rescission, but simply, as an effort to mitigate.

With regard to the rental of the Premises to a Halloween store, Flagship asserts that Excel is repeating an argument made unsuccessfully to the jury, that the temporary rental of the Premises during the litigation and just prior to trial barred Plaintiffs' constructive eviction claim. Flagship asserts that Excel's reference to the Rule 50 motion transcript fails to report that the Court denied Excel's Rule 50 motion on the constructive eviction claim. (Flagship's Supp. Excerpts of Record, Exh. 0, 1415–1450). Flagship asserts that Excel did not argue to the jury that the Halloween store payment was a ground to deny rescission; the jury found for Flagship on the constructive eviction claim and that Flagship had mitigated its damages.

Flagship's entry into the Forebearance Agreements with The Money Store and its continued payment of rent did not constitute a waiver of any right to rescind the lease. Flagship continued to make the rental payments under protest. Excel's trial counsel affirmatively represented to the Court during trial that Flagship's continued payment of rent did not impair Flagship's ability to rescind the lease, nor was it used to argue waiver. The Court made an evidentiary ruling and limited evidence and argument to the jury based on Excel's representation. To now allow Excel to argue that Flagship's continued payment of rent waived any right of rescission would be rewarding bad faith and is wholly inconsistent with Excel's earlier position, upon which the Court relied in making rulings and Flagship relied in limiting its proof. It would give Excel an unfair advantage which prejudices Flagship at this late stage of the proceedings. The elements of judicial estoppel are met and Excel is estopped to claim waiver based on the Money Store loan and Flagship's rent payments.

As to Flagship's attempts to market the premises for sublease and its sublease in October 2003 do not establish Flagship's waiver of rescission. Excel never argued to the jury or during the lengthy post-trial proceedings that these actions by Flagship waived any right of rescission. Excel's conduct is unacceptable. Flagship's actions to reduce its losses were under protest and do not constitute a waiver of the right of rescission.

c. *Rescission Barred Because Flagship Failed to Proffer Written Consent of The Money Store to Extinguish the Estate Created by the Ground Lease as Required by Section 22.4.*

For what appears to be the first time, Excel now argues that rescission is barred because Flagship failed to proffer the written consent of The Money Store to extin-

guish the estate created by the Lease as required by Section 22.4 of the Lease.

Section 22.4, captioned "No Merger of Title," provides:

There shall be no merger of this Lease or the estate created by this Lease with any other estate in the Premises or any portion thereof by reason of the fact that the same person, firm, corporation or other entity may acquire or own or hold, directly or indirectly:

(a) this Lease or the estate created by this Lease or any interest in this Lease or in any such estate and

(b) any other estate in the Premises or any part thereof or any interest in such estate, and no such merger shall occur unless and until all persons, corporations, firms and other entities, having any interest (including a security interest) in (i) this Lease or the Estate created by this Lease and (ii) any other estate in the Premises or the improvements or any portion thereof shall join in a written instrument effecting such merger and shall duly record the same.

Excel contends that an order granting rescission would effectively extinguish the leasehold estate created by the Ground Lease and thereby merge Flagship's former leasehold estate into Excel's fee estate. This merger, Excel argues, is prohibited by Section 22.4 in the absence of The Money Store's written consent, which Flagship did not proffer. Excel cites *Swanston v. Clark,* 153 Cal. 300, 304, 95 P. 1117 (1908) as authority.

*Swanston,* a more than 100 year old case, first surfacing eight years after this action commenced, involved an action to enforce specific performance of a written contract to sell real estate. The complaint alleged that the contract consisted of a lease for five years and an option to the lessees to purchase the property at any time during the term of the lease for a fixed price per acre; that plaintiffs, the lessees, elected to buy the land pursuant to the option, made due tender of the purchase price and demanded execution of the deed, which defendant refused; that two clauses to which the parties had agreed, to the effect that the plaintiffs were to allow improvements made by them during their possession to remain on the premises, in case they failed to exercise the option to purchase, and that plaintiffs should pay the rent for the five years, if they did not sooner exercise the option to purchase, were, by mutual mistake, omitted from the contract, and that by like mistake a clause was inserted giving plaintiffs the right to remove such improvements if they did not purchase. The defendant, in her answer, alleged that the contract had been rescinded by her before the plaintiffs' tender. The Supreme Court affirmed, sustaining a demurrer to this part of the answer:

It did not aver an offer to repay the plaintiffs the money expended by them in improvements on the land, but only to repay the moneys 'paid her by them' and 'to restore everything received by her under the agreement.' The complaint alleges the making of valuable improvements by the plaintiffs on the faith of the option to purchase. This special answer did not deny the making of these improvements and it cannot be said that the improvements had been 'received' by the defendant. Hence, the offer to restore, as alleged in the answer, did not include an offer to compensate the plaintiffs for the moneys expended by them in improving the property and was insufficient to accomplish a rescission. Again, a party to a contract cannot rescind at his pleasure, but only for some one or more of the causes enumerated in section 1689 of the Civil Code. One seeking to rescind a contract, or to enforce a rescission when he claims he has effected in the manner provided in section 1691 of the Civil Code, must allege

facts showing that he had good right to rescind, and for what cause a rescission had taken place, or that a rescission had been made by consent ... The same rule controls where a rescission is averred as a defense ... The special defense does not aver any facts in regard to defendant's right to rescind and does not show a rescission by consent. It is therefore insufficient.

The court did not err in adjudging that the defendant should convey the land free from all liens and encumbrances. The contract provided that she should convey it free from all liens and encumbrances, 'except such as may be created by the terms of this instrument as a lease of said premises.' The conveyance of the property to the plaintiffs in fee would effect a complete merger of the two estates, and the lease would not thereafter be an encumbrance. The execution of the deed by the defendant would be a complete performance so far as the lease was concerned. The contract, as reformed, did not contemplate or provide that she should retain any right or interest under the lease after she had conveyed in pursuance of the option, even if it did not have that effect before reformation. The lease, therefore, did not constitute an encumbrance within the scope of the covenants in a grant deed. We cannot, upon these appeals, take notice of any liens for reclamation district taxes that may have accrued after the trial. The defendant, it may be observed, could have escaped that liability at any time by performing the liability accrued. The statement in the record relating to the motion made by defendant to amend the judgment so as to except such liens, and the order denying the same, show that the judgment was entered before the motion and order were made. It was therefore an order made after final judgment and it cannot be reviewed on appeal from the judgment itself. The defendant did not appeal from the order. As to the liens for ordinary taxes, which may be presumed to have accrued between the time of plaintiffs' tender, in January, 1903, and the date of the entry of the judgment, in January, 1905, it is sufficient to say that the defendant, having refused to accept the money and make the deed as the judgment declares she should have done, is in no position to complain of the consequence of her own breach of contract.

Flagship replies that Section 22.4 is not an anti-rescission clause:

Rather, its purpose is simply to prevent the extinguishment of the Lease by operation of the doctrine of equitable conversion in the event the ground upon which the restaurant was acquired by Flagship, the lessee [sic]. This clause simply has no application to Plaintiffs' claim of rescission. Nor does this provision make a third party's consent necessary for the Plaintiffs to elect any particular remedy. It simply prevents a merger of the leasehold estate with the fee estate, in order to protect secured lenders such as The Money Store. In fact, this provision is simply a confirmation of the equitable nature of the doctrine of merger, and the principle 'that the doctrine [will] not be applied to extinguish a leasehold estate when the lessee acquire[s] the fee, when the application of the doctrine would [prejudice] the rights of an innocent third party.'

In so asserting, Flagship cites *6424 Corporation v. Commercial Exchange Property, Ltd.*, 171 Cal.App.3d 1221, 217 Cal. Rptr. 803 (1985).

*6424 Corporation* involved real property subject to a 99–year ground lease which began in 1912. Holland Park Investors (Holland) became the owner of the leasehold interest on December 17, 1980. The

leasehold at that time was subject to purchase money encumbrances consisting of a $400,000 first trust deed in favor of Commercial Exchange (CEL), an $840,000 all-inclusive second trust deed in favor of La Mesa Enterprises (La Mesa), and a $2.2 million all-inclusive third trust deed in favor of Commercial Exchange Property (CEP). Holland immediately sold its leasehold interest to the Kures. Two days later, the Kures purchased the fee interest in the property, thereby becoming concurrent owners of the fee and the leasehold. Two years later, the Kures conveyed their interests in the property by grant deed to IFR Realty, which the next day conveyed the property to Wendt. In that transaction, Wendt executed and delivered a trust deed in favor of IFR which encumbered the fee. A year later, IFR assigned Wendt's trust deed to 6424 Corporation. Thereafter, 6424 Corporation brought an action for declaratory relief and cancellation of instruments, asserting that the leasehold was merged with the fee when the Kures acquired concurrent ownership of both estates, with the result that the liens associated with the trust deeds of CEL, La Mesa and CEP were extinguished. The trial court granted summary judgment for CEL, La Mesa and CEP, declaring that the leasehold and the fee did not merge so as to render their trust deeds invalid. The Court of Appeals affirmed:

> While various arguments for reversal and in support of the trial court's determination are proffered by the parties, we are of the view the matter is disposed of by a principle sufficiently fundamental as to require little discussion, namely that: 'The doctrine of merger is to be applied in a manner calculated to prevent injustice, injury and prejudice to the *rights of innocent third persons* [such that] it has been held that the doctrine [will] not be applied to extinguish a leasehold estate when the lessee

acquire[s] the fee, when the application of the doctrine would [prejudice] the rights of an innocent third party.' ....
> In contravention of this well-founded and manifestly equitable proposition, what is sought to be established by appellant is no more nor less than that, based solely upon the circumstance of the fee and the leasehold estates having been placed in the ownership of the Kures, the otherwise legitimate interests of respondents, acknowledged and accepted as valid by the Kures ..., should be found to have disappeared, through application of a rule which in all events 'arose out of the fondness of the law for convenience and symmetry, [but which] was never designed to defeat the rights of a third party, which had intervened before the merger took effect.' ....

171 Cal.App.3d at 1223–1224, 217 Cal.Rptr. 803.

Excel argues that *6424 Corporation* is distinguishable:

> There, the lease did not contain an anti-merger clause, whereas here, § 22.4 specifically requires the signature of all interested parties as a precondition to extinguish the lease. Furthermore, it was the *tenant* in *6424 Corp.* that had acquired the fee estate and, thereafter, wrongfully attempted to escape its liabilities by extinguishing the interests of the leasehold mortgagees via merger. In contrast, here, the effect of the tenant rescinding would be to merge the lease estate into the *landlord's* fee estate. The litigation issues in *6424 Corp.* were the result of the absence in that lease of a provision such as § 22.4. *6424 Corp.* is actually a case study to remind practitioners to include clauses such as § 22.4, particularly in long-term ground leases.

Flagship argues that The Money Store consented to the prosecution of the action,

including the claim for rescission when it entered into the Forebearance Agreements with Flagship. Flagship refers to Paragraphs 6–7 of the October 2001 Forebearance Agreement:

D. The parties have reached an agreement to forebear on the existing collection actions and lawsuit. In consideration of the mutual promises, covenants, conditions and terms set forth herein, and in consideration of the accuracy of the Recitals, which are hereby confirmed and incorporated into this agreement by this reference, the undersigned parties hereby agree as follows:

. . .

6. TMSIC hereby agrees to release its interest in the Modesto Property at 1800 Prescott Road in Modesto, California for the sum of $900,000 provided that sum is the proceeds from the result of the sale to Mr. Valdez and Mr. Vaca or such other tenant as the landlord may approve provided that the minimum release payment from such other tenant as the landlord may approve will be $900,000 or the net proceeds available from the sale, whichever is greater. It is understood that this payment amount shall be applied to past due arreages on the Modesto loan and then to the principal on the Modesto loan. At no time should the payment under this paragraph exceed the balance due under the loan.

7. Flagship and Reiche agree to execute an appropriate assignment to Money Store and TMSIC the [sic] net proceeds of the litigation of Reiche and Flagship in Case No. 290308, in Stanislaus County [removed on February 21, 2001 and assigned Case No. CV–F–02–5200]. The proceeds will be applied to the past-due arrearages on the Modesto Loan, if any, and then to a reduction of the principal balance. Flagship will be reimbursed for all costs, attorney fees and expert witness fees and other ex-penses incurred in the litigation, including Flagship's payment of rent to the landlord since the closure of Flagship's restaurant on April 1, 2001. The reimbursement will first come from the proceeds of the litigation. The first $500,000.00 of the net proceeds would go to TMSIC. Any net proceeds over $500,000.00 from the litigation will be equally divided between TMSIC and Flagship. TMSIC will share in the net proceeds only to the extent required to satisfy past-due arrearages on the Modesto Loan and pay the principal balance on the Modesto Loan in full.

(Excel's Response, Exh. B). Flagship asserts that the interests of The Money Store were fully protected in the Forebearance Agreement "and no intent is evinced by that agreement that The Money Store, originally a party to the lawsuit and well aware of Flagship's claims for rescission, had any objection to the remedy of rescission."

Excel replies that Flagship's reliance on Paragraphs 6–7 of the October 2001 Forebearance Agreement is misplaced. Referring to Paragraph 6, Excel contends: "Obviously, Plaintiffs never adduced evidence of a sale to Mr. Valdez and Mr. Vaca or anyone else, because such event did not occur." Excel contends:

Nothing in the Forebearance Agreement provides the written consent required by § 22.4. On the contrary, the Forebearance Agreement requires Plaintiffs to pay rent and otherwise maintain the Ground Lease in good standing to protect TMS's security interest. (*Id.* at ¶¶ 4, 7).

Excel asserts that the October 2002 Forebearance Agreement deleted paragraph 6 and was silent with respect to The Money Store's security interest.

Excel's view of the terms of the October 2002 Forebearance Agreement are mis-

placed. While the references to the proceeds of the sale to Valdez and Vaca were deleted, it does not appear that the October 2002 Forebearance Agreement "was silent with respect to The Money Store's security interest." Section F of the October 2002 Forebearance Agreement provides:

The parties have reached an agreement to forebear on the existing collection actions. In consideration of the mutual promises, covenants, conditions and terms set forth herein, and in consideration of the accuracy of the Recitals, which are hereby confirmed and incorporated into this agreement by this reference, the undersigned parties hereby agree as follows:

1. Money Store and TMSIC shall forebear from filing their Notice of Sale on the Stockton Loan and the Modesto Loan.

. . .

4. Flagship and Reiche shall continue to make monthly lease payments on the Modesto Property to Excel Realty Partners . . . .

5. Net proceeds of any litigation between Reiche and Flagship in the United States District Court, Eastern District case . . . will be applied to past due arrearages on the Modesto Loan, if any, and then to a reduction of the principal balance. Flagship will be reimbursed for all costs, attorney fees and expert witness fees and other expenses incurred in the litigation, including Flagship's payment of rent to the Landlord since the closure of Flagship's restaurant on April 1, 2001. The reimbursement will first come from proceeds of the litigation. The first $500,000.00 of the net proceeds will go to TMSIC. Any net proceeds over $500,000.00 from the litigation will be equally divided between TMSIC and Flagship. TMSIC will share in the net proceeds only to the extent required to satisfy past due arrearages on the Modesto Loan and pay the principal balance on the Modesto Loan in full.

6. The forebearance of publishing the Notice of Sale shall continue until the earlier of the failure of Reiche and Flagship to honor each and every term and condition obtained herein, the issuance of a final judgment in Case No. CIV–F–02–5200 REC DLB, in the United States District Court, Eastern District, or twelve (12) months from the date of execution of this Agreement.

(Excel Response, Exh. C.).

Flagship further asserts: "[A]s noted on the record, The Money Store received payment, and accordingly no longer has any interest in the property." In so asserting, Flagship refers to the transcript of a status conference on February 15, 2006:

THE COURT: All right. And as I then would understand it, all of this activity that is the subject of concern happened after the trial and after Mr. Reiche's accident.

MR. FAIRBROOK: Yes . . . A year and a half after the trial, we did enter into negotiations and we retired that obligation. And, as a result, the only significance to this case is that the Court had indicated in its prior ruling that we would receive as compensation interest on that loan, not—the principal was never alleged to have been an item of damage, but simply the financing charges. [¶] And in the submission that we submitted to your Honor, we stopped the accrual of that interest at the same time as that loan was retired, and that's the only significance that I can see on this.

(Flagship's Supp. ER, Exh. Q, 4:23–5:13). Flagship also submits Exhibit S in its Supplemental Excerpts of Record, a Substitution of Trustee and Reconveyance of Deed of Trust dated September 20, 2005, wherein The Money Store reconveyed any inter-

est is the lease as part of the deed of trust to Flagship.

Excel moves to strike Exhibit S to Flagship's request for judicial notice filed in support of its reply brief and pages 15:20–16:19 of Flagship's reply brief. Alternatively, Excel moves for leave to file a sur-reply brief.

In moving to strike, Excel relies on the Supplemental Scheduling Conference Order filed on August 14, 2009 (Doc. 499), states: "Plaintiff shall not raise any new matter in the reply memorandum of law."

It is Excel, not Flagship, that raised this issue in its opposition brief. The Supplemental Scheduling Order was not intended to preclude Flagship from responding to arguments made by Excel in its opposition to Flagship's motion.

Excel also bases its motion to strike on the ground that Flagship's exhibit and argument violate that "Memorandum Decision Re Rescission Damages and Availability of Prejudgment Interest" filed on November 14, 2006, 2006 WL 3300395 (November 14, 2006 Memorandum Decision; Doc. 387), which Excel asserts barred evidence of Flagship's post-trial dealings with The Money Store. The portion of the November 14, 2006 Memorandum Decision discussing accrued interest on The Money Store Loan through trial, provides:

> Most critically, what Wallace did not do was to calculate (or otherwise consider) the effect of the foreclosure agreement on the calculation of interest accruing after October 2001. Nor did he give credit for the $900,000 lump sum payment or calculate interest based on the reduced unpaid principal balance resulting from the lump sum payment. It was incumbent on Plaintiffs to make these calculations. They have not done so. They have failed to prove the amount of any accrued unpaid interest on the Money Store Loan and the effect of the

forbearance agreement on the accrual of interest. *Plaintiffs did not present this information at trial and refused to provide such evidence post trial. They are bound by their choice. Plaintiffs shall not recover any other accrued interest.*

(Doc. 387; 20:9–21, emphasis added). Excel argues that Flagship is bound by this ruling and by their choice that evidence of Flagship's post-trial dealings with The Money Store will not be admitted. Excel contends that Flagship now attempts a "back door maneuver" to put into the record evidence that the November 14, 2006 Memorandum Decision bars, Exhibit S. Excel contends that the stated purpose for proffering Exhibit S is to show that The Money Store received payment and, accordingly no longer has any interest in the property:

> Plaintiffs had the burden to prove at trial that they were entitled to rescind the Ground Lease, but they failed to meet it. It was not Excel's burden to prove that rescission was unavailable. Plaintiffs failed to adduce evidence of TMS's consent to a merger of the Ground Lease estate with the fee, which would be the direct result of the rescission Plaintiffs sought. Evidence of TMS's consent was essential for Plaintiffs to comply with § 22.4, and Plaintiffs are foreclosed from proffering it now.

As the ruling provides, Flagship was precluded from offering evidence about postjudgment interest. To the extent that Excel moves for leave to file a sur-reply brief addressing the impact of Exhibit S, the motion is moot. Excel's arguments in opposition to Flagship's discussion of Exhibit S have been fully considered.

Flagship was not required to obtain Excel's written consent to the Money Store loan. There is no merger. Excel's arguments fail.

*CONCLUSION*

For all the reasons stated, the lease, in its entirety, allows for rescission and California law would give effect to rescission of the lease under the totality circumstances of this action.

IT IS SO ORDERED.